## LIEBKE *et al., Appellants,* v. KNAPP.

1. **Corporation:** STOCK: PAYMENT. Payment of shares in a corporation may be made otherwise than in money.

2. ———: STOCK PAID UP IN ADVERTISING: PUBLIC POLICY. It is not *ultra vires* a corporation organized for the purpose of carrying out a public enterprise, *e. g.* the building of a bridge over the Mississippi River, to contract with the proprietor of a newspaper to have published therein statistical articles and communications favoring the project, and showing the value of the enterprise as an investment; neither is such a contract contrary to public policy.

3. **The Consideration** of a written agreement may be shown by parol.

4. **Full Paid Stock:** CONSIDERATION: NEWSPAPER ARTICLES. Certain shares of the stock of a corporation organized to construct a bridge over the Mississippi River were issued to the proprietor of a newspaper published in the city where the bridge was to be built. The consideration therefor, was the publication of articles and communications in the newspaper favoring the enterprise and pointing out its need and value to the community, and its standing as an investment. It was not contended that the consideration was inadequate. *Held,* that the stock was fully paid.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

*Geo. M. Stewart* and *J. H. Wieting* for appellants.

*Glover & Shepley* for respondents.

SHERWOOD, J.—The plaintiffs under the provisions of the statute, moved the circuit court that execution issue against the defendants, claiming that the latter were the holders of certain shares of unpaid stock in the Illinois and St. Louis Bridge Company.

The contract made with the bridge company, as evidenced by a communication addressed by John Knapp to C. K. Dickson, president of that company, and his reply thereto, is set forth in the following letters, both bearing date September 30th, 1867:

John Knapp to C. K. Dickson, president of the bridge company:

" I am desirous of becoming an associate in the bridge company, and hereby authorize you to propose my name for that purpose, and if elected will take $20,000 dollars of stock of said company."

On the same day C. K. Dickson, as president, addressed the following letter to John Knapp:

" This is to certify that your proposition to subscribe for $20,000 of the stock of the bridge company is made with the express understanding that the first 5,000 of said subscription is to be deemed as paid in full by you. When a call is made on the stockholders beyond $5,000 or twenty-five per cent of their subscription, you will be expected to pay such calls, or to notify me of your decision to limit your subscription to $5,000, instead of $20,000, when your interest in the company will be limited to that sum, which will be deemed full paid stock."

The subscription thus made was subsequently enlarged

to $25,000 and transferred to the joint names of the defendants. All of the amount thus subscribed was paid on calls from time to time, except the $5,000, for which a credit was duly given and entered on the books of the company, after the services for which the credit was allowed had been rendered.

The circuit court on hearing the evidence adduced, found for the defendants, thereby determining as a matter of fact that payment of the $5,000 had been made; and as no declarations of law were asked on either side, no law point has been saved, so that the only question the record presents is whether there is any substantial testimony in the evidence to establish the payment claimed by the defendants to have been made.

The authorities are not in entire accord as to whether the payment of a stock subscription can be made in anything else than money, some holding one

1. CORPORATION: stock: payment.

way and some the other. But the class of authorities which declare that a subscription may be paid otherwise than in money, we regard as asserting a more reasonable doctrine, a doctrine better adapted to the practical affairs of business life. Regarding the matter then in this light, we shall rule that payment of stock subscriptions need not be in cash, but may be in whatever, considering the situation of the corporation, represents to that corporation a fair, just, lawful and needed equivalent for the money subscribed. Any other doctrine than this would, as it seems to us, place a corporation at a disadvantage, under a disability not contemplated by the law and under which a natural person does not labor. Besides, a corporation, unless prohibited by statutory provisions, has a general capacity of contracting which the common law concedes to every one ordinarily competent to enter into binding engagements. *Baile v. Ins. Co.*, 73 Mo. 371, and cases cited.

The services to be rendered by the defendants were to consist of statistical articles, communications, etc., to be

2. ——: stock paid up in advertising: public policy. furnished by the friends of the bridge to be published from time to time in the Missouri Republican, and were similar in character to those other persons pay for. These articles were furnished and published to the full extent of the credit entered on the books of the bridge company, and the testimony tends to show that the value of the services rendered and of the privileges thus afforded in the Republican, were even greater than the amount charged and agreed to be paid prior to the services performed. The objection is made that no data were given as to the precise value of the services rendered and of the privileges afforded. This objection is more specious than sound. In the very nature of things it would be impossible to tell with any degree of accuracy just how much in dollars and cents each day's publication of articles, statistical and otherwise, as well as communications, would be worth; and more than all, to tell beforehand just how long such publications would be required. Let us, as we lawfully may, look at the surroundings of the parties at the time the contract complained of was made and thus determine if it was such an one as the law will sanction. A great public enterprise was afoot, no less than the spanning of the Mississippi River with a bridge, connecting two states and affording easy, rapid and uninterrupted transit for the travel and commerce between them as well as the travel and commerce of the whole country. That enterprise, in and of itself, was in every respect and particular legitimate and praiseworthy, and had previously received the sanction of the congress of the United States. In order to its success it was pre-eminently necessary that the public mind should be awakened and informed, touching the magnitude and importance of the undertaking, and of the prospective benefits to be derived from its being carried into successful execution. Large sums of money were necessary to be raised to bring about the completion of the bridge. Large sums were necessary to be raised to condemn or purchase property to be

used in connection with the bridge and its approaches.
The means chosen by the company, it would seem, were
wisely chosen, and were doubtless the best that could have
been employed. If the company had seen fit to issue cir-
culars containing facts, statistics and arguments in favor
and in furtherance of the enterprise, no doubt, it seems,
could have arisen as to the lawfulness of such a method of
making known the objects and benefits of the contem-
plated undertaking. If such a method be considered law-
ful the disbursement of the funds necessary to pay therefor
would seem to follow as an unavoidable sequence. But
such a method of communication would though lawful,
have been unusual, while that employed was not only
usual but it would seem the most practical and satisfactory
one for communicating with the public. It is true that the
contract made with the proprietors of the Republican may
be termed, in colloquial language, a "lumping bargain,"
but it is not easy to see how a contract more definite and
particular in its terms could well have been made. Noth-
ing is more customary than for a client to contract with
his attorney to give him such a sum in gross for his serv-
ices to be rendered in a particular case or during a certain
period of time. Nothing is more customary than for a
railroad corporation to make an agreement with a con-
tractor for digging a cut or making a fill, agreeing to re-
munerate him therefor with a sum in gross. If such bar-
gains are to stand it is difficult to see why the one now un-
der consideration, though occupying the same footing,
should be seriously called in question.

Nor do we find any reason for holding that evidence
of the agreement that defendants were to pay for $5,000 of
3. T H E CONSIDERA--
TION.        the stock subscribed by publications of the
character mentioned, is evidence of a con-
temporaneous parol agreement, varying the written con-
tract, and therefore inadmissible. It is always competent
to show by parol the circumstances surrounding the par-
ties at the time a contract is entered into, and always com-

petent to show in like manner the consideration of that contract; and this without infringing the rule prohibitory of the introduction of evidence touching contemporaneous oral agreements. The consideration of the contract evidenced by the letters was not expressed therein, and had it been it was doubtless competent to show another and different consideration, or to show that the agreement, though made for a payment in money, had been discharged in whole or in part in another way. It is always competent to explain or contradict the consideration clause even in a deed, such clause possessing only the force and character of a receipt. *Fontaine v. Boatmen's Savings Institution,* 57 Mo. 561; *Hollocher v. Hollocher,* 62 Mo. 267; *Baile v. Ins. Co., supra.* Evidence as to the consideration was therefore, *a fortiori,* admissible in a case of this sort.

If our conclusion be the correct one that the services rendered by the defendants in the manner stated were a valid

4. FULL PAID STOCK: consideration: newspaper articles. and needed equivalent for the amount of stock which the defendants acquired thereby, that amount of stock cannot be regarded as stock only nominally paid for, but in point of fact, and in point of law, must be held as "fully paid up shares." In the language of Lord Justice Gifford in *Drummond's case,* 4 Ch. App.772: "If a man contracts to take shares he must pay for them, to use a homely phrase, in meal or in malt; he must either pay in money or money's worth; if he pays in one or the other that will be a satisfaction." So far has this theory been pushed by the English courts that, although the statute expressly provided that "every share in every company shall be deemed and taken to have been issued and to be held subject to the payment of the whole amount thereof in cash, unless the same should have been otherwise determined by a contract duly made in writing and filed with the register of joint stock companies at and before the issue of such shares," still, notwithstanding this statute, it was held that a credit by the company to a shareholder on account of a conveyance to them of specific property, such as

they were authorized to purchase, was deemed a payment in cash. *Coates' case*, L. R., 17 Eq., 169; *Spargo's case*, L. R., 8 Ch. App. 407. And the conclusion reached in these cases rests upon the common sense idea that the statute did not exact of the company the barren form, the idle ceremony, of taking a check from the share-holder for the value of his stock with one hand, and giving him simultaneously with the other a check for the same amount for the property which they were authorized to purchase from him. *Fothergill's case*, L. R., 8 Ch. App. 270. And accordingly it was ruled by those courts that in a proceeding to charge a share-holder as a contributory any evidence that will support a plea of accord and satisfaction will present a good defence. *Spargo's case, supra.* This doctrine of the English courts on the point in hand has been recently fully approved and followed in Maryland. *Brant v. Ehlen*, 59 Md. 1, and that court held that as the bill in that case did not seek to set aside the sale of the coal land to the company on the " ground of fraud," that therefore the question must be dealt with upon the assumption that the sale of the land and the purchase of the stock therefor were made in good faith. Mr. Justice Thompson after reviewing the whole subject announces a similar conclusion: "A corporation may take in payment of its shares any property which it may lawfully purchase. Such a transaction is not *ultra vires* or void, but is valid and binding on the original share-takers and upon the corporation, unless it is rescinded or set aside for fraud. While such a contract stands unimpeached, the courts, even where the rights of creditors are involved, will treat that as a payment which the parties have agreed should be payment." Thompson on Stockholders, § 134. In this case confessedly there is no fraud and consequently that element is out of view.

But it is urged that the contract respecting the stock which was to be paid for in the manner stated was altogether inoperative and void in law, as being against public policy and open, upright and fair dealing. We have

attentively considered this branch of the case. The evidence indisputably establishes that, though the editorials of the Republican favored the prosecution of the enterprise of the building of the bridge, yet that no charge was made for these editorials. It would seem, then, that the position of the plaintiffs goes so far as this, that if the editors and proprietors of a newspaper honestly and in good faith favor and support editorially the prosecution of a great public work eminently beneficial to the people of the immediate vicinity, and indeed of the whole country, a work previously sanctioned by governmental authority, that this ought to and does render void any contract for remuneration for the publication in their paper of such articles as reading matter which tend to further and foster that work. Such a position we regard as wholly untenable and these are our reasons therefor.

This case in all its circumstances materially differs from those cases of which *Fuller v. Dame*, 18 Pick. 472, is the type. In that case Fuller, the plaintiff, and stockholder in a certain railway company, by reason of securing the location of the depot for that railroad on certain flats, was to receive a direct personal and pecuniary benefit, a certain amount in money over and above that received by those with whom he was associated in that company. This, of course, would tend to warp his judgment and tend to make him exert an undue influence in securing for a private moneyed consideration a particular location for the depot, and thus rendered that contract void as repugnant to public policy and injurious to the public interests. Here, on the contrary, the defendants did not seek to locate the bridge at a particular point, nor were they employed to do so, nor were they to receive any superior individual advantages or any moneyed consideration for so doing. All the stock they received was to be paid for and was paid for in money or money's worth, and this whether the enterprise failed or prospered. Therefore, judgment affirmed. All concur.