## SHIELDS, Appellant, v. HOBART et al.

### In Banc, March 4, 1903.

1. **Corporation:** LIABILITY OF STOCKHOLDERS: TO CREDITORS. The stockholders of a corporation are liable to the creditors of the company to an amount equal to the unpaid balance due on the nominally paid-up certificates of stock issued to them.

2. ———: ———: ———: CREDITOR'S BILL: CONCURRENT REMEDIES. A suit in equity against the stockholders of a corporation to subject to the payment of a judgment creditor of the company, the unpaid balance due the company on nominally paid-up stock issued to them, is a concurrent remedy with that provided by the statute (sec. 2519, R. S. 1889).

3. ———: ———: ———: ALLEGATION OF FRAUD. In an equity suit against the stockholders of a corporation to subject to the payment of a judgment creditor of the company the unpaid balance due the company on nominally paid-up stock issued to them, it is not necessary to charge fraud.

4. ———: PREFERENCE: PRIVATE DEBTS OF OFFICERS. Where the assets of a corporation are insufficient to satisfy its corporate debts, its managing officers can not use those assets to pay their private debts as against the claims of existing creditors of the company who complain. Such a payment is prima facie fraudulent.

5. ———: ———: ———: UNLAWFUL DIVIDENDS: SET-OFF: FRAUD. Where the notes of a corporation which its managing officers, as indorsers, have paid, were the result of fraudulent and unauthorized reduction and distribution of the capital stock of the company under the disguise of dividends, the courts can not, in an equitable suit by a judgment creditor of the corporation against its stockholders to subject to the payment of his debt the unpaid balance of the paid-up stock issued to them, set off the amount paid on such unlawful notes against the balance remaining unpaid on their stock. Such a preference given by the managing officers to themselves, is prima facie fraudulent, and the burden rests on them of showing that such notes were honest obligations of the company.

6. ———: ———: ———: ———: FRAUDULENT: SET-OFF. In an equitable suit by a judgment creditor of the company against its stockholders to subject to the payment of his debt the unpaid balances due the company on the stock issued to them as fully paid up, notes of the company which its directors and managing officers have personally indorsed and paid, can not be set off, if such notes grew out of a sale of notes held by the company and by it indorsed and sold to raise money afterwards distributed as dividends, or distributed without sale as dividends, but afterwards paid by using money realized from the sale of the notes sought to have set off against the judgment creditor's claim.

7. ———: ———: ———: ———: ———: CONCEALING BOOKS: EVIDENCE. Where such managing officers have the books of the company in their possession and willfully conceal them from investigation, the mere offering in evidence of the company's notes indorsed by them, without any further showing, will not authorize the courts to hold that they were legal obligations of the company, but it will be assumed that the evidence tending to show that the notes were the result of distributing the company's capital as dividends was true.

8. ———: DIVIDENDS: WHEN AUTHORIZED. Dividends can not be paid out of the capital contributed by stockholders for the purpose of carrying on the company's business. They can be paid only out of profits or the net increase of the capital.

9. ———: ———: FRAUD ON CREDITORS. It is a fraud on creditors contracting with a company on the faith of its capital stock, to distribute a part of the capital stock as dividends.

10. ———: ———: PREFERENCE: UNPAID STOCK: CASE STATED. Ten persons bought 160 acres of land for $26,000, and then incorporated themselves into a company with a capital of $100,000

and to each was issued paid-up stock for $10,000, although at that time $74,000 of the capital was not paid in. Then they sold 180 lots for $54,000, mostly on credit, and distributed these sale notes and some cash to the amount of $26,000 to the stockholders, having first indorsed the sale notes, thus compelling the company, when the purchasers defaulted, to further deplete the capital by incurring debts to make good their payment, and a part of them were indorsed by two of the directors. *Held*, in a suit by a judgment creditor of the company against the stockholders to subject the unpaid balance of their paid-up stock to the payment of his judgment, *first*, that the action of the directors in distributing the $26,000 in cash and notes was in defiance of the law of corporations; second, that the directors who personally indorsed these notes, could not set up, against the claim of the judgment creditor who had no notice of their methods of doing business, that they had by paying the notes indorsed by them fully paid up all the stock issued to them; *third*, the action of the managing officers, who indorsed the notes secured by a deed of trust on the rest of the lots which they foreclosed to protect their own interests, is prima facie fraudulent as against creditors, and the mere production of notes indorsed by them falls far short of the proof which a court of equity requires to overcome the presumption of fraud.

11. ———: ———: CONVERSION OF PART: PRESUMPTION. Where a large part of the capital stock is shown to have been illegally converted by the managing officers of a corporation, it will be presumed, in the absence of a full explanation, that the whole was fraudulently so converted.

Appeal from Greene Circuit Court.—*Hon. Jas. T. Neville,* Judge.

REVERSED *(with directions).*

*Heffernan & Heffernan* and *Wm. G. Pettus* for appellant.

(1) The defendants Byron F. Hobart and the estate of J. S. Ambrose, deceased, can not maintain their set-offs as against their liability to plaintiff as unpaid stockholders to the Real Estate Investment Company for the following reasons: (a) There can be no set-off unless the debts are mutual and in the same right. Sawyer v. Hoag, 17 Wall. 622; Story's Eq. Jur. (11 Ed.), 1436, 1437. (b) The statutory in-

dividual liability of a stockholder is not a debt due by him to the company; forms no part of the assets of the company, but is a supplemental or superadded security for the benefit of creditors. Thompson, Liability of Stockholders, secs. 342-386; Hanson v. Donkersley, 37 Mich. 184. The liability of a stockholder for unpaid stock is in the nature of a guaranty or a superadded security, flowing directly from the stockholder to the creditors. Hence, there is no mutuality between such a liability and the debt due by the corporation to the stockholder. Black & Co's Case, L. R. 8 Ch. 261; Baker v. Atlas Bank, 9 Metc. 197. "Nothing is a specialty but a writing under seal." Thornton v. Lane, 11 Ga. 502; Shickle v. Watts, 94 Mo. 410; Alberger v. Bank, 123 Mo. 319. "Where the dissolution of a corporation sufficiently appears *aliunde,* it is not necessary to obtain a judgment dissolving the corporation before proceeding under the statute against a stockholder." Shickle v. Watts, 94 Mo. 411; Roan v. Winn, 93 Mo. 503; Wood v. Davidson, 89 Mo. 445; Bent v. Priest, 86 Mo. 475; La Grange Stc. Co. v. Bank, 122 Mo. 154; Suddath v. Gallagher, 126 Mo. 401; Foster v. Planing M. Co., 92 Mo. 79. While the directors of a corporation do not sustain the strict relations of trustees for its creditors, yet their duties to them and their relations to the corporation itself are such as impose upon them some of the obligations of trustees. In dealing with the corporation they deal with themselves. They should, therefore, be required, in case they give themselves a preference over other creditors, to show that all their secured debts are fair, honest and justly due them. This burden properly rests upon them. Schufeldt v. Smith, 131 Mo. 290; Thompson, Liability of Stockholders, secs. 342-386; Hanson v. Donkersley, supra. (2) A pledge of corporate assets by directors "will be scrutinized by a court of equity with the most rigorous and zealous observation." Chouteau v. Allen, 70 Mo. 338. The president of the corporation will not be permitted to create such a relation between himself and the trust property as will make his own

interest antagonistic to that of his beneficiary. Brewster v. Stratsman, 4 Mo. App. 41; McAllen v. Woalcock, 60 Mo. 174; Wait on Insolvent Corp., sec. 641. Nor can directors contract with themselves to sell property to the corporation upon terms to be fixed by them as directors. Wait, sec. 641; Coleman v. Railroad, 38 N. Y. 201; Butts v. Wood, 37 N. Y. 317; Wait, 642-644; Parker v. Nicherson, 112 Mass. 196; Bent v. Priest, 10 Mo. App. 557. Shares must be paid up in full. Morawetz, sec. 589. When the overvaluation is so great that the fraudulent intent appears on its face and is not explained, the court will hold it to be fraudulent as a matter of law. Cook on Stock and Stockholders, sec. 47; Douglas v. Ireland, 73 N. Y. 104; Boynton v. Andrews, 63 N. Y. 93; Osgood v. King, 42 Iowa 478; Schenk v. Andrews, 25 N. Y. 113; Van Cleve v. Berkey, 143 Mo. 109. Where persons purchase land with the view of organizing a corporation to purchase it of them, then organize such a corporation and sell the land to it at a price in advance of what they gave for it, they are bound to restore to the corporation the difference between the price paid by them for the land and the price at which they sold it to the corporation. Simons v. Vulcan Oil & Mining Co., 61 Pa. St. 202; Thompson, Liability of Officers, p. 172; McElheny's Appeal, 61 Pa. St. 188; Wait on Insolvent Corporations, secs. 639, 641, 642, 644. A director of a corporation is a trustee of the corporation and is chargeable with all profits secretly made out of the trust relation. Bent v. Priest, 10 Mo. App. 557; Seehorn v. Hall, 130 Mo. 261; Land Co. v. Case, 104 Mo. 572. The capital stock of a corporation, which is subject to the operation of this rule, consists of all the stock for which the members have subscribed. Adler v. Milwaukee Patent Brick Co., 13 Wis. 57; Hightower v. Thornton, 8 Ga. 436; Briggs v. Penniman, 8 Cow. 387; Allen v. Railroad, 2 Ala. 437; Slee v. Bloom, 19 Johns. 456; Wood v. Dummer, 3 Mason 308; Mann v. Pentz, 3 N. Y. 422; Payne v. Bullard, 23 Miss. 90. The corporation had no authority to borrow money to declare dividends. R. S. 1889, sec.

2773; R. S. 1889, secs. 2515-2773.   Dividends can not be paid out of the capital stock.   It is a favorite doctrine of the American courts that the capital stock and other property of a corporation is to be deemed a trust fund for the payment of all the debts of a corporation; so that the creditors have a lien or right of priority of payment on it in preference to any of the stockholders of the corporation.   Thompson on Liability of Stockholders, sec. 10; Story's Equity Jurisprudence, sec. 1252; Wood v. Dummer, 3 Mason 308; Vose v. Grant, 15 Mass. 505; Spear v. Grant, 16 Mass. 15; Baker v. Bank, Metc. 192; Mumma v. Potomac Co., 8 Pet. 286; Curran v. Arkansas, 15 How. 304; Tarbell v. Page, 24 Ill. 46; Ogilvie v. Ins. Co., 22 How. 387; Payson v. Stoever, 2 Dill 431; Sawyer v. Hoag, 17 Wall. 610; Burke v. Smith, 16 Wall. 390; New Albany v. Burke. 2 Wall. 96; Hightower v. Thornton, 8 Ga. 486; Robinson v. Carey, 8 Ga. 530; Reid v. Eatontor Co., 40 Ga. 102; Slee v. Bloom, 19 Johns. 456; Briggs v. Penniman, 8 Cow. 395; Mann v. Pentz, 3 N. Y. 422; Hard v. Tallmann, 60 Barb. 272; Bank v. Powers, 25 Ala. 612; Curry v. Woodward, 53 Ala. 375; Smith v. Huckabee, 53 Ala. 195; Paschall v. Mitsett, 2 Ala. 472; Allen v. Railroad, 2 Ala. 437; Adler v. Milwaukee Patent Brick Co., 13 Wis. 57; Bassett v. St. Albans Hotel Co., 2 Ohio 274; s. c., 13 Ohio 197; Henry v. Vermilion Co., 17 Ohio 187; Mass v. Burroughs, 1 Woods 467; Payne v. Bullard, 23 Miss. 90; Tinkham v. Borst, 31 Barb. 407. The balance unpaid on subscription to stock is a trust fund in the hands of stockholders, for the payment of debts.   Cornell's App., 5 Cent. Rep. 181; 114 Pa. 153; 139 U. S. 229; Upton v. Triblicock, 91 U. S. 45; Currier v. Lebanon Slate Co., 56 N. H. 262; Osgood v. King, 42 Iowa 478; Melin v. Ins. Co., 80 Ill. 446.   The trust can not be defeated by any device short of an actual payment in good faith.   Sawyer v. Hoag, 84 U. S. 17; Boynton v. Hatch, 47 N. Y. 225; Schaeffer v. Ins. Co., 46 Mo. 248; Patnan v. New Albany, 4 Bliss. 365; Re Baglan Hall Colliery Co., L. R. 5 Ch. 346; Guest v. Worcester, B. & S. R. Co., L. R. 4 Q. B. 9.   The spoliation

of the corporation books raises a presumption against him who destroys them. Drosten v. Mueller, 103 Mo. 624; 1 Greenleaf, Evidence, secs. 31, 37; Wharton on Evidence, sec. 1264. Defendant Hobart was charged with the knowledge of the destruction of the corporation books, was in the courtroom all the time during the trial, and heard the charges. His failure to go on the witness stand to deny complicity or explain, carries with it the usual unfavorable and damaging presumptions. Ins. Co. v. Smith, 117 Mo. 294; Henderson v. Henderson, 55 Mo. 534; Cass Co. v. Green, 66 Mo. 498; Goldsby v. Johnson, 82 Mo. 602; Leeper v. Bates, 85 Mo. 224; Mabory v. McClurg, 74 Mo. 575.

*Benj. U. Massey* for respondent Bigbee.

(1) The debts contracted by the Real Estate Investment Company, for which the notes, signed by the company and indorsed by Ambrose and Hobart, were given, arose out of bona fide business transactions. They were incurred in the legitimate conduct of the business of the company. If attacked for fraud, the facts constituting that fraud, must be specifically stated in the petition, and must be clearly proven at the trial; no mere presumptions are permitted. Kitchens v. Railroad, 69 Mo. 229; Alberger v. Bank, 123 Mo. 313; Milling Co. v. Commission Co., 128 Mo. 473; Schufeldt v. Smith, 131 Mo. 280. (2) These note debts of the Real Estate Investment Company which were paid by Ambrose and Hobart, by reason of their indorsement thereon, can be set off by them, in this suit against the claim of plaintiff Shields. The payment of these notes of the company by Ambrose and Hobart by reason of their said indorsement, could have been pleaded by them, as a set-off in a direct suit of the corporation against them, and therefore this plea is good in this suit against Shields, a corporation creditor. Reed v. Bott, 100 Mo. 62; Bank v. Worthington, 104 Mo. 91; Bank v. Bank, 130 Mo. 155.

*Adiel Sherwood* for respondents in Division Two.

(1) The judgment in No. 9408 should be affirmed because: (a) When defendant Hobart paid the notes of the Real Estate Investment Company due the Bank of Springfield, H. B. Louderman and John Thoms upon which he was indorser, and to which were attached real estate notes of said investment company secured by deeds of trust, he became entitled to enforce said deeds of trust for the purpose of reimbursing himself as far as possible. The same result followed when defendant Hobart joined with Ambrose in his lifetime and with defendant Bigbee, administrator, afterwards, in paying the notes of said investment company due Laclede Bank, St. Louis, Commercial Bank and Springfield Savings Bank at Springfield, and $4,100 due W. D. Sheppard, and other notes upon which Hobart and Ambrose were indorsers and to which deeds of trust were attached as collateral—in short, they too became entitled to enforce said deeds of trust to reimburse themselves as far as possible. Colebrooke on Collateral Securities (2 Ed.), and cases cited, sec. 212; Taylor v. Jester, 23 Mo. 244; Berthold v. Berthold, 46 Mo. 577; Benne v. Schnecko, 100 Mo. 257; Bispham, Eq., secs. 335, 336; Furnold v. Bank, 44 Mo. 336; Bank v. Kemble, 61 Mo. App. 216; Allison v. Sutherlin, 50 Mo. 274; Furguson's Admr. v. Carson's Admr., 86 Mo. 679; Vest v. Green, 3 Mo. 219; Harper v. Kimble, 65 Mo. App. 515; Sheldon on Subrogation (2 Ed.), secs. 86, 87, 93; Cauthorn v. Berry, 69 Mo. App. 409. (b) In August, 1893, when the Laclede Bank, St. Louis, Bank of Springfield, Commercial Bank, and Springfield Savings Bank, and Louderman and others demanded collateral security for notes held by them the Real Estate Investment Company had the legal right to execute notes and deeds of trust (corresponding in amount to the notes outstanding in the hands of these parties) and deliver them as collateral security. The validity of that transaction can not be questioned. Jaffrey v. Matthews, 120 Mo. 317; Alberger v. Bank, 123 Mo. 313;

Alberger v. White, 117 Mo. 347; Mansur-Tebbetts Imp.
Co. v. Ritchie, 143 Mo. 605; Callihan v. Powers, 133
Mo. 498; Wagner-Gates Co. v. Ziegler-Zaiss, 128 Mo.
473. And that action might have been followed by a
general assignment without affecting its legality. Cal-
lihan v. Powers, 133 Mo. 498. In fact, such action
might well have been taken directly for the benefit of
Hobart and Ambrose, who were directors, to protect
their indorsements, and this is true even if they were
present at the meeting of the directors and voting to
accomplish that result. Butler v. Land and Mining
Co., 139 Mo. 476; Alberger v. Bank, 123 Mo. 313; Schu-
feldt v. Smith, 131 Mo. 280; s. c., 29 L. R. A. 830; Foster
v. Planing Mill Co., 92 Mo. 87. (c) The circuit court
found that the investment company was solvent till
October 1, 1897. The record shows that all of the debts
intended to be secured by the deeds of trust executed
and delivered in August, 1893, were contracted long
prior to January 1, 1893; in fact, the statement sent to
H. M. Noel & Co., showed this fact clearly. As long
as a corporation is in possession of its property which
is not affected by legal process, it may deal with it as
an individual and the "trust fund" doctrine does not
apply. Butler v. Land & Mining Co., 139 Mo. 467;
Schufeldt v. Smith, 131 Mo. 280; Alberger v. Bank, 123
Mo. 313. In fact, the "trust fund" theory is not the
law in Missouri. Bank v. Bank, 130 Mo. 155; Foster
v. Planing Mill Co., 92 Mo. 87; Bank v. John Moran
Packing Co., 138 Mo. 59. (d) There is not a particle
of evidence in the record which shows anything but the
most perfect good faith in the execution and delivery
of the five deeds of trust under which, after foreclosure,
Mrs. Hobart, Bigbee, administrator, and the Crescent
Iron Works acquired title. Prima facie a note or obli-
gation is valid and executed with authority. Bank v.
Worthington, 145 Mo. 91. (e) The burden is upon
plaintiff to show that the conveyance attacked is fraud-
ulent and void as to him, and further, plaintiff must
prove that the vendee had actual knowledge of, and
participated in, the fraud. There is no such proof in

this record. Mansur-Tebbetts Co. v. Ritchie, 143 Mo. 611; s. c., 45 S. W. 640. (2) The judgment in No. 9411 should be affirmed, because: (a) The creditor of a corporation (suing at law, where there is a statute to authorize that proceeding, or in equity, under a properly drawn bill), who sues to subject to the payment of his judgment an unpaid balance upon a stock subscription made to the corporation, has no higher or better right than the corporation would have suing to recover an alleged unpaid balance. Chandler v. Louisville Banking Co., 69 Ill. App. 605; Bonte v. Cooper, 90 Ill. 444; Musgrave v. Glen Elder Co., 49 Pac. 338; Scott v. Windham, 16 So. 206; Pandville Co. v. Clark, 25 Conn. 97; Carr v. Hamilton, 129 U. S. 252; Scott v. Armstrong, 146 U. S. 499; Colebrooke, Collateral Securities (2 Ed.), sec. 226. Hence it is, that whatever defense or set-off the stockholder has against the corporation may be pleaded by the stockholder against the creditor's judgment with the same force and effect as if the corporation itself were plaintiff. Skiles v. Houston, 110 Pa. St. 254; Scott v. Armstrong, 146 U. S. 511; Light v. Leininger, 8 Pa. St. 403; Hade v. McVay, 31 Ohio St. 231; Bank v. Bank, 130 Mo. 155; s. c., 31 S. W. 761. In this last case, this subject is discussed very elaborately and with great learning and ability,—and standing by itself is more than ample authority for affirming the judgment of the circuit court. (b) The doctrine of set-off originated in equity, for the fixed rules of the common law often led to injustice, because the law and equity systems were separate and distinct and it was necessary to seek equitable interference to procure the benefit of a set-off, cross-demand, etc. Byles on Bills, 350; Colebrooke, Collateral Sec. (2 Ed.), sec. 266. The right to set off against plaintiff's judgment the amounts defendant Hobart has paid to protect his indorsements rests upon the plainest principles of law, equity and natural justice, for, otherwise plaintiff would recover his judgment in full with interest and costs and be made entirely whole plus the lots given to secure the pay-

ment of the real estate notes he purchased—while defendant Hobart would still further increase the losses he has already sustained.    Bank v. Bank, 130 Mo. 155; Jerman v. Benton, 79 Mo. 162; Jones v. Hossop, 3 Hare 568; Holbrook v. Ins. Co., 6 Paige 220; Webber v. Leighton, 8 Mo. App. 502; Bank v. Ibbotson, 24 Wend. 473; Tallmadge v. Fishkill Iron Co., 4 Barb. 382; Agate v. Sands, 8 Daly 67; Garrison v. Howe, 17 N. Y. 458; Agate v. Sands, 73 N. Y. 620; Mathez v. Neidiz, 72 N. Y. 100; Briggs v. Cornwell, 9 Daly 436; Wheeler v. Millar, 90 N. Y. 354.    All of these New York cases are cited with approval in Jerman's Admr. v. Benton, 79 Mo. 157; Ins. Co. v. Hill, 12 Mo. App. 148; Coquard v. Prendergast, 35 Mo. App. 243.    (c)    If the allegations of the petition make this case an action at law it must fail because several stockholders are joined as parties defendant, when as a matter of fact the liability of each is separate and distinct and each one must be separately sued.    Bank v. Ibbotson, 24 Wend. 479; Abbott v. Aspinwall, 26 Barb. 208; Perry v. Turner, 55 Mo. 542; State Savings Ass'n v. Kellogg, 63 Mo. 542; Leucke v. Tredway, 45 Mo. App. 514; Parmelee v. Williams, 71 Mo. 410.    (d)    This action will most probably be construed as one at law and a motion for execution against a stockholder under our statute—disregarding the great number of superfluous and redundant allegations.    It is in substance and effect a garnishment.    Wilson v. Railroad, 108 Mo. 588.    In no garnishment proceeding can the plaintiff collect any greater sum than the garnishee owes the defendant. Remedy by garnishment is legal and not equitable. Lackland v. Garesche, 56 Mo. 267. Legal and equitable distinctions are maintained in Missouri, as of old.    Maguire v. Taylor, 47 Mo. 115; Conway v. Reed, 66 Mo. 340; Rush v. Bryan, 101 Mo. 586; Santer v. Leveridge, 103 Mo. 615; Miller v. Railroad, 105 Mo. 455; Mench v. Bunch, 90 Mo. 500; Bliss v. Pritchard, 67 Mo. 191; Snyder v. Free, 114 Mo. 367; Young v. Schofield, 132 Mo. 661; Boles v. Bennington, 136 Mo. 529; Hollis v. Richardson, 13 Gray (Mass.) 392; Read v. Smith, 1

Allen (Mass.) 521. It follows, if this view be correct, that whatever would defeat the company in a suit against the stockholder to recover an alleged unpaid balance, will be fatal in a garnishment proceeding. Drake on Attachment, sec. 672; McDermott v. Donegan, 44 Mo. 89.

*W. M. Williams* and *Adiel Sherwood* for respondents in Banc.

(1) This being an action at law, tried by the court without a jury, and no instructions having been asked or given, there is nothing before this court for review. Weilandy v. Lemuel, 47 Mo. 323; Bozarth v. Lincoln L. of H., 67 S. W. 679; Wischmeyer v. Richardson, 153 Mo. 558. (2) Case 9411 is an action at law for the following reasons: (a) The petition upon its face shows that a judgment having been secured against the Real Estate Investment Company and execution having been returned *nulla bona,* plaintiff seeks to collect that judgment by subjecting to its payment unpaid balances alleged to be due upon stock of said company subscribed for by defendants—in short, plaintiff is pursuing his statutory remedy. (b) The allegation "that plaintiff has no adequate remedy at law" is a bald, barren, legal conclusion and states no facts which a court of equity can lay hold of and certainly can not be said to bring the case within any recognized head of equity jurisdiction. Such an allegation is a mere matter of inference. Shelton v. Platt, 139 U. S. 596; Hoester v. Sammelmann, 101 Mo. 624. All such allegations are mere legal conclusions which are not even admitted by general demurrer. Mallinckrodt Chemical Works v. Nemnich, 69 S. W. 358; Wing v. Hay, 10 Bush (Ky.) 276; Kittinger v. Traction Co. (N. Y.), 54 N. E. 1081; Murdock v. Brown, 15 Mo. App. 547; Young v. Schofield, 132 Mo. 650; Curry v. Cabliss, 37 Mo. 335; Boles v. Bennington, 136 Mo. 522; Luduke v. Railroad, 6 Mo. App. 578; Cooper v. French, 52 Iowa 531; Harrison v. Railroad, 74 Mo. 369; Railroad v.

Robinson, 35 Ind. 380; Seeley v. Engell, 17 Barb. 530.
Every fact which the plaintiff must prove to maintain
his suit, is constitutive in the sense of the code and must
be alleged.   Pier v. Heinrichoffen, 52 Mo. 336; Gurley
v. Railroad, 93 Mo. 450; Railroad v. Dunlap, 25 Ind.
430.   (c)   Under our judicial system, while both law
and equity are administered by the same tribunals, the
old-time distinctions are preserved and to make a case
in equity plaintiff must bring his case within some
recognized head of equity jurisdiction by a statement
of facts sufficient to lead to that conclusion.   (d)   A
court of equity has no jurisdiction unless the statement
of facts in the petition brings the case within some
recognized head of equity jurisdiction, and that juris-
diction can only be shown by a statement of facts which
can be denied.   Clark v. Ganz, 21 Minn. 387; Duck v.
Peeler, 74 Tex. 268; Gas Co. v. Higby, 25 N. E. 660;
Shelton v. Platt, 139 U. S. 596; Crisman v. Heiderer,
5 Colo. 589; Waldron v. Marsh, 5 Cal. 119; Carlisle v.
Stevenson, 3 Md. Ch. 505; Benton Co. v. Morgan, 64
S. W. 123; Planet Property Co. v. Railroad, 115 Mo.
619; Winter v. City Council, 9 So. 366; Michael v. St.
Louis, 112 Mo. 614; McClanahan v. West, 100 Mo. 323;
Albany Mining Co. v. Auditor, 37 Mich. 393; Donovan
v. Railroad, 89 Mo. 146; Oelrichs v. Spain, 15 Wall.
211; Hoey v. Coleman, 46 Fed. 221; Lewis v. Cooke,
23 Wall. 466; Story Eq. Pl. (10 Ed.), sec. 473; Mallin-
ckrodt Chemical Works v. Nemnich, 69 S. W. 538; Hoe-
ster v. Sammelmann, 101 Mo. 624; Bliss, Code Plead-
ing (3 Ed.), secs. 210, 213, 413 and note.   (3)   In Mis-
souri there is no conflict in the authorities that in the
suit of a judgment creditor against a stockholder to
recover alleged unpaid balances due upon his stock
subscription, the stockholder may set off debts of the
corporation paid by him.   Bank v. Bank, 130 Mo. 155;
Guerney v. Moore, 131 Mo. 671.   One stockholder is
not surety for another—there is no joint and several
liability.   Guerney v. Moore, 131 Mo. 671.   (4)   As
there is no allegation in the petition about the illegal

payment of dividends, it is not necessary to discuss the question, because no such issue was raised in the trial court, and no such issue is before this court. In addition, the record shows that whatever dividends were paid were distributed in 1887 and 1888, and none after the spring of 1889, when Judge Biggs removed to St. Louis. The trial court found that the Real Estate Investment Company was solvent and a going concern till October 1, 1897. Moreover, the Real Estate Investment Company was a real estate corporation organized for the purpose of platting and selling a certain tract of land, and naturally the proceeds of the sale of that land were intended for distribution among the stockholders of the company. The land owned by the company had been paid for and the company was not in debt at the time such dividends were declared and paid, and did not become indebted for several years afterwards when the "sale notes" indorsed by the company commenced to come back upon the company on account of the default of the makers thereof. Further, a director is not liable at common law for the payment of dividends if declared in good faith, and this is true notwithstanding the corporation may subsequently become insolvent. Our statute, derived from New York, fixes a definite rule, because to make a dividend illegal the corporation must be insolvent at the time of the declaration thereof or the payment thereof must make the corporation insolvent, and no director absent at the time of declaration is liable, and no director is liable who dissents and follows the statute in making known his views. Sec. 983, R. S. 1899.

PER CURIAM.—The above-entitled cause having been heard and considered by the Court in Banc, the opinion of GANTT, J., in Division Two is adopted as the opinion of the court. *Robinson, C. J., Brace, Gantt, Burgess, Valliant* and *Fox, JJ.,* concur *in toto; Marshall, J.,* concurs in the views expressed, but is in favor of reversing and remanding the cause for a new trial.

GANTT, J.—On or about the last days of February, 1887, Lucius Hubbell of the real estate firm of Wooley, Porter & Hubbell of Springfield, Missouri, for one thousand dollars cash paid, obtained an agreement from George M. Jones to convey to said Hubbell a tract of land adjoining the city of Springfield, containing about one hundred and sixty acres, for the sum of twenty-six thousand dollars, to be paid in thirty days. Before the expiration of the thirty days said Hubbell obtained the agreement of nine other parties to share said purchase with him, each to pay the sum of twenty-six hundred dollars, and together they paid the twenty-six thousand dollars, and on March 29, 1887, said Jones conveyed the said land to said Hubbell. It was further agreed between the ten purchasers that they would organize a business corporation to take over said land and that it should be capitalized at $100,000 and each of said ten purchasers should receive stock in said company of the par value of $10,000.

On March 31, 1887, these same ten men signed and executed articles of association of the Real Estate Investment Company, reciting therein that the capital stock of $100,000 had been fully paid up and was in the hands of the persons named as the first board of directors and that each of the ten signers, to-wit, L. W. Hubbell, W. H. Biggs, Geo. A. C. Wooley, W. O. Gray, E. D. Pearce, T. E. Burlingame, J. S. Ambrose, B. F. Hobart, J. T. Gray and W. G. Porter, Jr., held twenty shares of the par value of $500 each. Articles of incorporation were duly filed and a certificate of incorporation granted and in due time stock of the par value of $10,000 was issued to each of said parties as fully paid. The testimony of Hubbell, the promoter, and of Biggs, one of the original board, and of Ramsay, the manager, establishes beyond question that none of these stockholders ever paid anything for their stock except the $2,600 which they each paid into the fund to buy the land, which was at once conveyed to the corporation on its organization by Hubbell for a recited consideration of $100,000, and which land was practically the

only asset the company ever had outside of a switch and a few lots purchased by it later on. As soon as practicable the company caused the land to be laid off as an addition to Springfield, conforming as near as possible to the streets of the city, and filed its plat and published maps of the addition. This was accomplished in September, 1887. The lots were rated from $150 to $400 each, according to desirability.

The testimony of Hubbell and Ramsay, who were the managers at different periods, disclose the following *modus operandi*:

The company would sell a lot, and if the purchaser was not able to build would advance him the money or materials for his house, and then take back notes, or real estate bonds, as one of the witnesses denominated them, secured by a first deed of trust on the whole and then the company would indorse this paper and sell it in the money market. In this manner something like 180 lots were sold in the first three or four years of the company's existence, or up to 1891 or 1892. The money received from the sale of these notes, and sometimes the notes themselves, were distributed as dividends to the corporators or stockholders to the amount of $26,000 or near that sum, but the evidence shows that a large number of those notes were not paid by the makers or owners of the lots when due, and as Hubbell testified, "it was not the policy of the company to allow them to default, and when the purchasers of the lots failed to make payment the company stepped in and paid them so as to keep its paper good," and it would seem that to get the money to do this from time to time, the company would make its notes, indorsed by the directors and the banks of Springfield and St. Louis, and when due would renew again, until toward the last Hobart and Ambrose were compelled to pay them to protect their indorsements.

In some instances the company would mortgage the property to raise the money and take second mortgages, but when the panic of 1893 came, the second

mortgages were wiped out completely by the decline in values.

Ramsay testified that when he became manager in 1891 there was from $12,000 to $18,000 of the company's paper outstanding indorsed by Hobart and Ambrose, who were directors of the company, and in 1893 it had increased to about $34,000, which came about by paying off interest on the indebtedness, and on account of notes coming back on the company which it had indorsed, and paying the running expenses, and taking up the old notes that had been indorsed.

In February, 1893, the company issued its notes secured by deeds of trust on unimproved lots, for $10,000, which it sold through the brokerage firm of H. M. Noell & Co., of St. Louis, $5,000 to plaintiff George H. Shields, and $5,000 to Mrs. Breed. Default was made in the payment of these notes, the deeds of trust foreclosed by sales, and thereupon plaintiff brought suit in the Greene Circuit Court and obtained judgment for $6,055.50, the balance due him on the notes held by him. Execution issued on this judgment and real estate which had theretofore belonged to the company, but which had been sold under other deeds of trust of August 19, 1893, and plaintiff became the purchaser and the execution was credited with $158.10, the proceeds of the sale.

The five deeds of trust of August 19, 1893, had been made by the company, covering all the land it then owned, to secure certain notes which it had put up as collateral to its notes already outstanding, which had been indorsed by Hobart and Ambrose and in some instances by the other directors and stockholders. Hobart and Ambrose were ultimately compelled to pay the notes which they had indorsed, and thereupon caused these collateral deeds of trust to be foreclosed, on September 23, 1897, and Ambrose got 60 of the 140 lots covered by these deeds of trust for $2,005, and Hobart bid $1,100 on certain of the lots and directed them to be conveyed to the Crescent Iron Company, and

for certain other lots he bid $2,819 and caused them to be deeded to Mrs. Hobart, his wife, these sums being credited on their notes against the company, which they had paid for it.

It appears that Hobart in this way paid $17,243.10 and Ambrose $6,310. Hobart also produced another note for the company for $1,000 which he loaned the company. The plaintiff in his endeavor to trace the origin of all this indebtedness endeavored to get at the books, but the defendants did not produce them, and it appeared that Ramsay, the manager of the company, when he learned the plaintiff intended to levy on them and had applied for an order to produce them, called in the negro porter, Henry Reed, at the Ozark Hotel in Springfield, and turned over to him the journal, cash book, ledger, sales book and stock book, which contained all the transactions of the Real Estate Investment Company for the years up to November, 1897, saying to the negro at the time they would probably be attached and to get them out of his office, he didn't care what he did with them; so he took them out of his office, and when on that day the order of the court to produce them was read to him or delivered to him, he made return that they were not in his possession.

The negro testified he put them in an elevator where the rubbish around the Ozark House was dumped and they remained there several days, when he was taken sick, and upon his return to work, they had been removed, and he did not know their whereabouts. The witness Ramsay boldly avowed his purpose to prevent plaintiff getting the information contained in the books, and says he wrote Hobart that day what he had done and received an acknowledgment of the letter. With the suppression of the books came a significant lapse of all memory of their contents by those who conducted the transactions recorded in them. Ambrose was dead at the time of the trial and was represented by his administrator.

H. M. Noel testified that he lived in St. Louis; was in the bond and brokerage business, and that Hobart

sold him the $10,000 in bonds, which witness sold to plaintiff Shields and Mrs. Breed; that Hobart informed him at the time that the bonds were amply secured, and only forty per cent of the realty belonging to the Real Estate Investment Company was mortgaged; that the company was solvent; that part of the $10,000 was to pay a note falling due and the remainder to be paid in betterments.

Hobart was present in court and sworn as a witness, but was not offered as a witness in his own behalf to explain the origin of the debts which he paid for the company until counsel for plaintiff in his argument animadverted upon his said failure and then he was offered as a witness, but the court declined at that time to reopen the cases.

Other facts may be noted in the opinion in the case. The circuit court found for defendants Hobart and Ambrose and against the other defendants.

Cause No. 9411 is a suit in equity by plaintiff, as a judgment creditor of the Real Estate Investment Company, against the defendants, who were seven of the original ten subscribers to and promoters of the said corporation, to subject to plaintiff's judgment the unpaid balance due from the defendants on their stock, on the ground that although stock was issued as paid up they had in fact paid only twenty-six per cent thereon and they were liable to plaintiff as a creditor to the full amount thereof.

The circuit court found as a fact that only twenty-six per cent was paid on the stock; that each of the stockholders was liable for $7,400 for the satisfaction of the company's debts, but found that as to Hobart and Ambrose they had paid more than they owed on their stock in paying their indorsements on the notes of the company, as set forth in the statement and answers of Hobart and Bigbee, administrator of Ambrose.

After timely motions for new trial and in arrest plaintiff appealed from the judgment of the circuit court.

I.   The circuit court's finding that of the one hundred thousand dollars of capital stock of the Real Estate Investment Company subscribed, the stockholders only paid into the treasury of the company twenty-six thousand dollars, or twenty-six hundred dollars each for the $10,000 worth of stock at par value allotted to them, is supported by all the testimony in the case, and it follows that under the laws of this State the court's further finding, that each of the defendants in the cause No. 9411 was liable to the creditors of the corporation for the unpaid balance of $7,400 on his twenty shares, followed as a necessary consequence. [Shickle v. Watts, 94 Mo. 414; Liebke v. Knapp, 79 Mo. 24; Shepard v. Drake, 61 Mo. App. 134; Van Cleve v. Berkey, 143 Mo. 109.]

But the circuit court further found that by the payment of the various notes issued by the corporation, Hobart and Ambrose had each subsequently more than paid the unpaid balance on their respective shares and credited them with these payments and rendered judgment for them against plaintiff, while giving him judgment against the other defendants, and it is this judgment of the court in favor of defendants Hobart and Ambrose's administrator which forms the basis of this appeal.

As already stated, this is a suit in equity which is a concurrent remedy with the statutory action at law given by section 2519, Revised Statutes 1899, in force when this suit was commenced and the judgment rendered.   [Shickle v. Watts, 94 Mo. 410; Van Cleve v. Berkey, 143 Mo. 109; Steam Stone Cutter Co. v. Scott, 157 Mo. 520.]

It is not necessary to enforce a stockholder's liability for his unpaid obligation for his stock to allege or prove fraud.   This was ruled in Shickle v. Watts, 94 Mo. 410, and while a different view was taken in Woolfolk v. January, 131 Mo. 620, so much of that opinion as announced that it was necessary to allege fraud was overruled and disapproved in Van Cleve v. Berkey, 143 Mo. 109, by the unanimous opinion of all the judges in

Banc, and it must now be regarded as settled that it is not necessary to charge fraud to subject the stockholder's unpaid liability to a creditor's judgment against the corporation.

The difficulties of the case arise from the uncertainty as to the origin of the debts which Hobart and Ambrose paid for the company.

These two defendants contented themselves with showing that in 1893 and prior thereto they had indorsed the company's notes or real estate bonds in the aggregate to the amount of $23,350, and that to protect the several notes of the company which they had indorsed, one for $3,000, one for $1,350, one for $2,000, one for $9,000, and one for $8,000, the company made its additional notes for these several amounts to Frank B. Smith and gave five deeds of trust conveying 140 lots of ground and these notes were indorsed by Smith and together with the respective deeds of trust given to secure each, were placed by the company as collateral security with the several banks and individuals who held the notes of the company indorsed by Hobart and Ambrose, and to secure the latter on their said indorsements.

The plaintiff endeavored to trace the origin and consideration of the notes indorsed by Hobart and Ambrose and in a general way, we think, established that a large proportion of this indebtedness grew out of the way in which the corporation conducted its affairs. He established quite conclusively by Hubbell, the manager of the company from 1887 to 1891, that it was the custom of the company to sell its lots, which constituted in fact its capital, to various purchasers on credit, or largely so, and take notes and deeds of trust to secure the purchase money, and to either sell these notes and distribute the proceeds as dividends or distribute these notes with the company's indorsement to the several stockholders as dividends. Many of these notes thus sold and divided as dividends were not paid by the makers, the purchasers of lots, when they became due, and the company to protect its credit would take up and

pay these notes by borrowing money or using the proceeds of other lots.

How many of these defaults occurred during Hubbell's management does not satisfactorily appear, as his memory was very indistinct when questioned on that subject, but they grew more and more frequent under Porter's and Ramsay's management in 1891, 1892 and 1893, by which time the indebtedness had grown on this account, principally to the bulk of its indebtedness, some $34,000, at the time it made the bonds for $10,000 of which the plaintiff became the owner of $5,000 in 1893. Ramsay says it was between $12,000 and $18,000 when he took charge in 1891. Plaintiff endeavored to reach the books, but when Ramsay, the manager, learned of his purpose he called in a negro porter and turned them over to him with the sole injunction to get them out of his office, and when the order of the court was served he answered these books were not in his possession. All efforts to trace the whereabouts of these books which contained a history of all the transactions of the company proved futile and this accounts for the failure of the plaintiff to show definitely and specifically the origin of the indebtedness on which Hobart and Ambrose were indorsers and for the payment of which they claim credits on their stock and offsets against their liability to plaintiff.

During all this time Hobart was a director of the company, and Ambrose was the president, until his death in 1897, and long after the corporation ceased to be a going concern. So that plaintiff could only show, as he did generally, that the corporators divided about $26,000 among themselves, the proceeds of the company's lots, but a large proportion of which constituted a liability of the company on account of its guaranty of the notes, and not properly a dividend earned. The defendants Hobart and Ambrose could have preserved the books of the company and shown the origin of every debt. After 1891 no dividends were paid. Hubbell testified the stockholders got back in dividends the amount they invested, or about $26,000; that "we sold

notes, the bonds that we received in payment of the lots,'' and in some instances divided the bonds themselves as dividends. ''Got very little money for the lots. Took notes and guaranteed their payment.''

Judge Biggs testified he received his dividend in both cash and notes, and collected the latter. He testified that according to the original understanding the company ought not to have been compelled to issue paper or indorse paper for any purpose.

No reasonable or rational evidence appears in the record to account for so large an indebtedness as was incurred by the company upon any other theory than that disclosed by Hubbell and Judge Biggs, and that is, that the indebtedness largely, if not altogether, grew out of the indorsement and guaranty of the company of the notes and real estate bonds it took from purchasers of its lots, and their default in paying the same, and the interest accumulating thereon.

With ample opportunity to have rescued the records of the company when notified by the manager, Ramsay, that he had turned them over to an utterly irresponsible character and to have condemned his conduct in suppressing evidence to which plaintiff was entitled, Hobart so far as the evidence shows, permitted the records of the company to lie in the dump pile in the elevator of the Ozark Hotel without a request to Ramsay to secure them.

In those books presumptively the origin of each note which he and Ambrose indorsed for the company and each renewal thereof, could have been traced.

Those books also were or should have been the repository of all the corporate acts of the company, and would have disclosed whether the corporation, through a lawful board, authorized the creation of said debts or the indorsement thereof by the company's directors; in short, whether these arrangements were the individual acts of Hobart and Ambrose self-imposed or were *lawful* acts of the corporation.

Vol 172 mo—33.

That a corporation while a going concern may prefer one creditor to another, must now be accepted as the law of this State. [Foster v. Mill Co., 92 Mo. 87; Meyer v. Folding Chair Co., 130 Mo. 188; Schufeldt v. Smith, 131 Mo. 280.]

But it is also settled by our adjudications that when a corporation has reached a point where its assets are insufficient to satisfy its corporate debts, its managing officers can not lawfully pay their private debts from the assets as against the claims of existing creditors of the company, who complain. As to the latter such a transaction is prima facie fraudulent. [National Tube Works v. Machine Co., 118 Mo. 365; Hall v. Goodnight, 138 Mo. 576.] With these principles in view it is essential to a proper determination of the respective rights of the parties to this litigation to ascertain, if we can, the true character of the offset which is presented against plaintiff's judgment.

Plaintiff's judgment being founded upon a note executed by the president of the company as such, and having been adjudged the debt of the corporation, is not open to attack in this proceeding by the defendants who are officers and stockholders of that company, and indeed is not questioned, and he has a right to have it satisfied out of any assets belonging to said company.

On the other hand, notwithstanding defendants Ambrose and Hobart only paid $2,600 each on their subscription for their stock of the par value of $10,000 each, under the rule announced in Savings Bank v. Butchers & Drovers Bank, 130 Mo. 155, in an equitable suit by a judgment creditor of a corporation against a stockholder to subject the stockholder's liability for the balance unpaid on his stock, the stockholder may set off a demand which he has against the corporation.

In that case it appeared that at the suit of one stockholder the defendant stockholder had been compelled to pay the full amount of his unpaid subscription and it was held to be a full satisfaction of his liability.

We are thus brought to the contention of the plaintiff that the notes and bonds offered by defendants Hobart and Ambrose were not lawful claims against the corporation, but were the result of a fraudulent and unauthorized reduction and distribution of the capital stock of the company under the guise of dividends, and that the preference which they gave themselves out of assets of the company over plaintiff who was an existing creditor, is prima facie fraudulent, and the burden devolved upon them of showing that all their secured debts were fair, honest obligations of the company and justly due them, and that they made no such showing.

In National Tube Works v. Machine Co., 118 Mo. loc. cit. 376, this court quoted with approval the statement of Morawetz on Private Corporations, vol. 2, sec. 789, that, "A corporation can not give away its property or transfer it, unless in good faith for value, if its creditors would thereby be left unsecured." What, then, is the nature of the debts which defendants Hobart and Ambrose propose to set off against plaintiff's judgment and how did they originate?

As already said, a large part thereof grew out of the sale of notes held by the company and by it indorsed to raise money to distribute as dividends and in some cases by the distribution of these notes without sale as dividends, and their makers having defaulted the company borrowed money to make them good and to keep up its credit.

It was for this money thus borrowed that the defendants became indorsers and finally paid these sums for which they ask offsets. If these notes were founded upon other lawful debts of the corporation, the law cast the burden on defendants to show that fact and what part of the notes, if any, originated outside of the indorsement of the so-called dividends.

They could have protected their records from spoliation and presumably have shown how every item of the debt thus originated, and being directors and trustees of the corporation, were bound to know how its

liabilities accrued and upon what basis they assumed to declare dividends, and why it was necessary, if they had earned sufficient profits over and above all liabilities to declare dividends, for the corporation to indorse and guarantee the paper of the purchasers of its property, but they have not done so and have contented themselves with offering in evidence notes signed by one of them, Ambrose, as president, and indorsed by the other, Hobart, who was a director, without showing that these notes were the legal obligations of the company for debts which it might properly contract. Having the power to show these notes were not, as the evidence tends to show, the result of distributing the capital as dividends, and failing to do so, we feel justified in starting with the assumption that this was their origin.

The statute governing business corporations like this at the time these transactions occurred, section 2773, Revised Statutes 1889, provided: "Dividends of the profits made by the corporation may be declared by the trustees or directors thereof every six months, or oftener, as the directors may elect; but no such dividends shall be made and paid to stockholders while such corporation is in an insolvent condition; and if the directors of any such corporation shall knowingly declare and pay any dividend when the corporation is insolvent, or any dividend the payment of which would render it insolvent, *or which would diminish the amount of its capital stock,* they shall be jointly and severally liable for all the debts of the corporation then existing, *and for all that shall be thereafter contracted while they shall respectively continue in office*: Provided, that if any of the directors shall object to the declaring of such dividend, or to the payment of the same, and shall, at any time before the time fixed for the payment thereof, file a certificate of their objections, in writing, with the clerk of the corporation and with the circuit clerk of the county they shall be exempt from the said liability."

Independently of this statute, which gives creditors an additional security against directors, it is a fundamental rule that dividends can be paid only out of profits or the net increase of the capital of a corporation and can not be drawn upon the capital contributed by the shareholders for the purpose of carrying on the company's business.

Neither the directors of a corporation, nor even the majority of the stockholders, have any authority to diminish the prescribed capital of the corporation by distributing a portion of it among the shareholders in the shape of dividends, for this would be a fraud upon creditors contracting with it on the faith of its capital stock.

Wood v. Dummer, 3 Mason 308-311, was a suit in equity brought by the unpaid creditors of a bank against the shareholders thereof upon the ground that the bank, while insolvent, had divided three-fourths of its capital stock amongst the defendants, leaving the plaintiff's debt unpaid. Justice STORY ruled that the defendants were liable to refund so much of the assets received by them as was necessary to pay creditors, saying, "If the capital stock is a trust fund, then it may be followed by the creditors into the hands of any persons having notice of the trust attaching to it. As to the stockholders themselves, there can be no pretense to say, that both in law and in fact, they are not affected with the most ample notice." [2 Morawetz on Corp., sec. 790; Bank v. Douglass, 1 McCrary 86.]

Dividends can only be properly declared from the profits over and above the capital stock and the debts of the company. [Barry v. Exchange Co., 1 Sandf. Ch. 307; Williams v. Western U. Tel. Co., 93 N. Y. 162.]

Now, the capital stock of the Real Estate Investment Company was one hundred thousand dollars, of which only twenty-six thousand dollars was paid into the treasury, though the stockholders and incorporators certified the whole amount was paid into the treasury and was in the custody of its directors. The trial court

had no difficulty in finding that as a fact only $26,000 was ever paid in, and that was invested in the 160 acres of land bought from Captain Jones.

Knowing absolutely that they never had paid up the capital stock, but owed $74,000 of it, the evidence is absolutely conclusive that when this company had sold (principally on credit, as Hubbell, the manager at that time, says they got "very little cash") about 180 lots for about $300 a lot or $54,000 in all, and when it was wholly problematical what amount of money they would realize out of these sales, and the sequel shows they did not receive over half of that sum at any time in actual cash for these lots, these directors proceeded to distribute the proceeds of these sale notes as dividends to the amount of $26,000 and had the corporation guarantee their payment. By no system of bookkeeping could this $26,000 be said to be profits under the facts brought to light on the trial.

Not only was it not in excess of the capital stock of $100,000 but if it had been added to the $26,000 paid in, it would only have swollen the whole assets to $52,-000, making no deduction for the corresponding diminution of the actual capital which was all invested in the lots, of which 180 were sold to produce the $26,000 in dividends.

This action of the directors in thus diminishing the capital stock was in defiance of the law of corporations.

While a corporation may with "the consent of its stockholders on proper notice reduce its capital stock," it is not pretended that the capital stock of this corporaton was reduced after due notice as required by the statutes of this State. The result, however, was reached by the distribution of these sale notes and their proceeds which were but another form in which the capital of the corporation was invested.

It is contrary to fundamental principles to permit shareholders to distribute the capital of a corporation among themselves. But this was exactly what was attempted by the directors and managers of this company under the guise of dividends, and that, too, when

each of the stockholders was indebted to the corporation in the sum of $7,400 on their unpaid liability, and the illegality becomes more pronounced when we consider that they did not in fact have the money but merely the promises of the purchasers to pay, and to insure the stockholders getting the money the directors indorsed these notes in the name of the corporation and thus compelling it when the purchasers defaulted to further deplete the capital by incurring debts to make good these unauthorized conversions of its capital.

It was these notes which the defendants Ambrose and Hobart signed, and thus and in this way they assert the company became indebted to them and that they are entitled to offset that indebtedness against a judgment creditor who had no notice of their methods of business.

In our opinion a debt thus created, however equitable it might be as to the shareholders who took their share of the capital with full knowledge of the scheme, is not such a claim against the company as can be offset against a judgment creditor. To permit it would sanction the distribution of the whole capital among the directors and stockholders at the expense of the creditors who have a right to look to the capital stock and assets of the company to satisfy their claims.

While it must be conceded that the exact amount of the notes which were sold and guaranteed as dividends and which subsequently fell back on the company and were paid by it by borrowing money with the indorsement of the directors is not specifically established, this is no fault of plaintiff, as he was diligent in his endeavor to throw all the light obtainable on the transactions, but was prevented by the intentional suppression of the books, and the burden was not on him but on the defendants Hobart and the administrator of Ambrose who pleaded the set-offs of debts which they alleged they held against the company. In the creation of the five deeds of trust which swept away the great bulk of the unincumbered lots, they had

their private interest at stake to protect their indorsements which seem to have been voluntarily made by them, and in such cases their acts are subject to the most rigorous scrutiny. [Hill v. Rich Hill Co., 119 Mo. 9, and cases cited.]

The trust relation which they bore to the corporation requires courts of equity to subject the preferences which they take to themselves to the most searching scrutiny and places upon defendants the burden of showing beyond question that they held bona fide, honest and just claims against the corporation which can be allowed as set-offs. [Schufeldt v. Smith, 131 Mo. 290.]

Prima facie they are fraudulent as against the creditors, and they are in no attitude to complain that plaintiff has not made that absolutely clear and certain which they had the opportunity and means of showing, but which they failed to show and even declined to testify. The mere production of notes executed and indorsed by themselves falls far short of that proof which a court of equity requires to overcome the presumption of fraud. The plaintiff showed that a large part at least was tainted with an illegal conversion of the capital to which he had a right to look, and where a part is fraudulent the whole may well be presumed to be in the absence of a full explanation.

The trial court properly found that in the absence of these set-offs, Hobart and Ambrose's estate each was indebted to the amount of $7,400 on their unpaid liability on their stock subscriptions, and while it found they had paid more than this balance, subsequently, it did not find that these payments were for honest, just, bona fide debts of the corporation, which would have sustained their preferences and constituted valid set-offs, and as this appeal is on the equity side of the court we are not bound by the conclusion reached by the circuit court.

In our opinion it erred upon the facts proven in not rendering judgment against Hobart and the estate of Ambrose that they were liable each for the unpaid

balance of $7,400 on their stock, and that plaintiff was entitled to have his judgment satisfied out of said liabilities as well as against the other stockholders defendants, and the judgment is reversed with directions to so enter the decree.

All concur.