# RICHARD HANLON MILLINERY COMPANY v. MISSISSIPPI VALLEY TRUST COMPANY, Appellant.

## Division One, June 28, 1913.

1. **ULTRA VIRES.** Where *ultra vires* is relied upon by the corporation as a defense, it must be pleaded.

2. **———: Corporations: Public Policy.** The defense of *ultra vires* to a suit against a corporation on its contract is rooted in public policy, and the protection of innocent stockholders of great financial institutions demands that their contracts be closely scrutinized for the purpose of ascertaining whether or not they had power to make them. The defense of *ultra vires* is bottomed upon a wise public policy that seeks to protect the stockholders of a corporation from contracts and business undertakings which the company is not authorized by the law to make or engage in.

3. **———: ———: Binding on Other· Party.** The defense of *ultra vires* made by a corporation which had no charter power to enter into the contract, is not unfair to the other party to the contract, because he is chargeable with knowledge of its limited and restricted charter powers, ·and with such knowledge he entered into the contract.

4. **———: Ratification.** If a contract is *ultra vires*, it is. void, and no subsequent act of the corporation by way of ratification or otherwise can breathe life into it.

5. **———: Trust Company: Power to Promote Another Corporation.** A trust company, organized under the laws of Missouri, cannot be the promoter of another corporation, or enter into a contract to promote another corporation.

6. **———: ———: ———: Power to Buy and Sell Stocks.** Power given to a trust company "to buy and sell all kinds of ·Government, State, municipal and other bonds and all kinds ·of negotiable and non-negotiable paper, stocks or other invest-

ment securities" is not power to promote the organization of another corporation. The power to "buy and sell" means the power to buy and sell in the ordinary course of commercial business.

7. ———: Contract Executed by One Side: Plea Unavailing. Where the contract by a trust company to promote a mercantile corporation is executed by said corporation only, the plea of *ultra vires* by the trust company, in a suit to recover secret profits made by it in promoting the organization of the other, would be unavailing, because a corporation cannot receive money to do a thing and failing to do it keep the money. But that is not the point decided in this case, because this is not a suit upon the *ultra vires* contract, but the contract is only evidentiary to show the relationship between the two companies—this being a suit to recover back the money paid under the contract.

8. ———: Recovery Back of Money Paid. If as a fact the trust company did promote the organization of a business corporation and in doing so did wrongfully make a secret profit of a certain sum of money, the trust company cannot ordinarily plead its *ultra vires* act (the act of promoting the organization of another corporation) as a defense to a suit to recover those secret gains. But whether or not it can avail itself of that defense depends upon who is attempting to recover the money.

9. ———: ———: Innocent Stockholder. None but innocent stockholders can, in the name of the corporation promoted by a trust company, sue for and recover in an action for alleged secret profits made by the trust company in promoting the organization of the corporation. Those stockholders who paid only thirty-five per cent of the face value of stock issued as full-paid, and who knew that the trust company received its stock on the same basis, cannot either themselves sue, or use the corporate name to sue, the trust company for secret profits made out of the stock issued to it. And in actions for the recovery of secret profits from promoters, the right of the corporation to sue, where the action is brought in its name, is no greater than the rights of the stockholders for whose benefit the suit is prosecuted; and the position of a stockholder, with knowledge of the facts at the time he acquired his stock, is not different from the position of a creditor having knowledge of the facts.

10. ———: ———: ———: Transferee. Stockholders who aid and participate in the issue of paid-up stock given to a trust company as a bonus for promoting the corporation, and by it sold at a secret profit, or who aid and participate in the issue and sale of full-paid stock at thirty-five per cent of its face value, having knowledge of those facts, and the transferee of

such stock with full knowledge of the facts, cannot afterwards complain of the transaction, either in their own behalf as stockholders or creditors or in behalf of the corporation. The stockholder is bound by the participation or acquiescence, and the transferee with knowledge has no greater rights than the transferer.

11. ————: **Stockholder: Borrowing Money to Pay for Stock.** Where a stockholder of a mercantile corporation borrowed money from a trust company to pay for his stock, and instead of using it for that purpose turned it back to the trust company, the trust company is not liable to the corporation for such money, even though the trust company had been the promoter of the corporation. It was the stockholder's money, and he could do what he pleased with it, and the fact that the trust company got it does not render it liable to the corporation.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench*, Judge.

Reversed.                                                •

*Boyle & Priest, Nagel & Kirby* and *Arthur B. Shepley* for appellant.

(1) After the amendment made to the second count of plaintiff's petition—the demurrer to the evidence having been sustained to the first count—it does not state a cause of action, Because: (a) If the defendant did not agree to subscribe, as therein alleged, to the capital stock of the plaintiff, there is no privity of contract between it and plaintiff, which would enable it to treat the defendant as a shareholder. (b) No charge of fraud or collusion, by which the defendant knowingly came into possession of assets of the Hanlon Company, is made against the defendant. (2) The demurrer to the evidence at the close of the whole case should have been given: Because, There is a total failure of proof of the allegation that the $20,000 was paid to defendant out of the funds of the Hanlon Millinery Company. The charge is that defendant: "Did in fact receive the sum of $20,000, out of the

$70,000 paid on account of stock subscriptions by other bona fide subscribers to the stock of said company." There is no proof to sustain this averment. (3) The defendant neither made subscription nor had the power to subscribe to the stock of a corporation or to promote directly or indirectly a corporation. Such an act is beyond the power of a trust company organized under the laws of Missouri. Anglo-American Co. v. Lombard, 132 Fed. 721. (4) There is no evidence "that defendant agreed to subscribe for and did subscribe for and receive and pay for the $200,000 preferred and in consideration of so doing it was unlawfully agreed between said defendant and said Hanlon that the defendant should receive the sum of $20,-000 out of the $70,000 paid on account of stock subscriptions by other bona fide subscribers to the stock of said company." This allegation in the second count of plaintiff's petition is the basis of its right of recovery against the defendant. The essence of the charge is this: That defendant subscribed for $200,-000 par value of the preferred stock of the Hanlon Millinery Company, in consideration that it should also receive from the assets of the company $20,000 in cash. If it was not a subscriber, it is not liable, even though it did receive $20,000 from the assets of the company, for then it was in no relation of trust or privity with the company or any of its shareholders, and there is no charge of fraud or collusion that would make it liable. If it did not receive the $20,000 from the assets of the company it is not liable, even though it was a subscriber, for then the company had no interest in the money so received. The proof is very certain and clear that it was not a subscriber for the $200,000 of preferred stock. That it was a direct subscriber is not claimed. The only claim is that by some sort of construction of the instrument, made in the form of a proposal by Hanlon to defendant, to organize a company, Hanlon became the agent for the defendant, and

Hanlon's subscription to the stock of the Hanlon Millinery Company was the subscription of the defendant. This written proposal carries no such meaning and is susceptible of no such interpretation. The $20,000 was never an asset of the Hanlon Millinery Company. It was paid defendant by Hanlon directly and from moneys borrowed by Hanlon on his own securities. (5) Even had the defendant, as a subscriber for the $200,000 preferred stock and in consideration of that subscription, received the $20,000 from the assets of the company there could be no recovery. Hanlon owns practically all of the stock. He acquired it to wind up the corporation which was in process of bankruptcy. He organized the company. He paid in only $15,000. All of its debts were settled at 33 1-3 cents on the dollar. He acquired all of the stock he now claims with the assets of the company in liquidation. With these he acquired the preferred stock for which defendant paid him $200,000. He acquired with these assets $173,000 of notes, which the company owed defendant for money loaned. He would be the only recipient of any recovery. Courts will not lend aid to accomplish any such fraud. There are no creditors or innocent subscribers of stock involved here. Copper Co. v. Lewisohn, 210 U. S. 206.

*Henderson, Marshall & Becker* for respondent.

(1) Reduced to a final analysis, the cause of action stated in the two counts of the petition is this: Prior to September 8, 1902, Hanlon had for many years been employed by other persons and corporations in the millinery business in St. Louis. Prior to that date the defendant, through its officers and agents, conceived and concocted and proposed to Hanlon a scheme or plan to organize a corporation to engage in the millinery business, and prepared a written proposition directed to itself and caused Hanlon to sign the

same, to organize the Hanlon Millinery Company, with a capital stock of $500,000, of which $200,000 was to be seven per cent cumulative preferred stock and $300,000 to be common stock. The defendant agreed to subscribe and pay for the $200,000 preferred stock and to receive a bonus of $100,000 of the common stock, and also a bonus of $20,000 of the $70,000 to be realized from the sale of the remaining $200,000 of common stock, which the scheme provided should be sold to or subscribed for by other persons at thirty-five cents on the dollar, thus starting the company with $250,000 cash, and giving to the defendant the bonus of $100,000 of the common stock, and the $20,000 in cash for promoting the scheme. The proposition prepared by the defendant and signed by Hanlon was accepted by the defendant; the corporation was organized along the lines aforesaid; the defendant taking the preferred stock and paying therefor and receiving the $100,000 common stock and the $20,000 cash out of the $70,000 which was realized from the sale of the $200,000 common stock at thirty-five cents on the dollar to other persons. Instead, however, of the defendant subscribing for the preferred stock in its own name, it caused Hanlon to subscribe for 19,998 shares (the remaining two shares it caused other persons to subscribe for), and also to subscribe for 2020 shares of the common stock, other persons subscribed for the remaining 980 of the common stock and paying for the same only thirty-five cents on the dollar. Neither the preferred nor the common stock was issued to Hanlon, but the certificates therefor were made out in his name and he was required to and did indorse said certificates to the defendant company, so as to conceal from the other stockholders the fact that the defendant was a stockholder and also to conceal from them all knowledge of the scheme aforesaid. But notwithstanding said certificates were indorsed by Hanlon to the defendant, the defendant re-

quired Hanlon to vote all of the preferred and common stock so acquired by it at all meetings of the corporations. So that none of the other stockholders knew as long as the defendant controlled three-fifths of the capital stock of the corporation and elected directors selected by it, anything concerning the scheme of incorporation or of the bonus in stock or the promoter's profit of $20,000 which the defendant received. The defendant continued to dominate and control the Hanlon Millinery Company until about June, 1907, when a new board of directors was selected, and when that board came into power and ascertained the facts aforesaid, it immediately made a call for the unpaid subscriptions to the capital stock payable July 1, 1907, and demand was made on defendant for the unpaid subscription of $100,000 for the common stock received by it as a bonus as aforesaid, and also for the $20,000 secret profits made by the defendant, which being refused this action was instituted. (2) It will not profit us nor in any manner aid this court in the determination of this case to consider whether or not all of the original subscribers for the stock in a corporation can agree among themselves that the stock will be full paid stock, either because something transferred to the corporation at a valuation placed thereon by such original subscribers, was or was not sufficient to pay for the stock in full, or whether anything was transferred in payment of the stock subscription. For no such condition is present in this case. Here the arrangement was made between Hanlon and the defendant, and was concealed from the subscribers for the nine hundred and eighty shares of the capital stock of the company, who paid their money therefor. Consequently this case does not fall within the limits of a discussion as to whether or not under the Constitution and laws of Missouri (whatever may be the law elsewhere), it is or is not legal or within the power of all of the stockholders or original subscribers for stock

in a corporation to agree that the stock shall be full paid stock, and thereby being *in pari delicto,* none of them can enforce payment for unpaid stock subscriptions. If it was necessary in this case we would insist that under section 8 of article 12 of the Constitution, which ordains "that no corporation shall issue stocks or bonds, except for money paid, labor done or property actually received," and under Sec. 962, R. S. 1899, carrying this constitutional provision into effect and under Sec. 1312, R. S. 1899, which requires incorporators to certify that all of the shares of stock in a business corporation have been bona fide subscribed and one-half thereof actually paid up in lawful money of the United States, and under the decisions in this State, no such arrangement could legally be made even if all of the stockholders or original subscribers and the company thrown in, should agree to it. For such an arrangement violates the Constitution and statutes of this State, and is contrary to the policy of the laws of this State as declared by the decision of the Supreme Court, that unpaid subscriptions on stock constitute a trust fund, under the American Trust doctrine, or assets, in the hands of the directors or trustees, for the benefit, first, of the creditors of the company; second, for the benefit of the future stockholders of the company, and third, for the benefit of the company itself, and that such unpaid subscriptions can be recovered in this State in a suit by the corporation itself or by any stockholder suing for himself and all other stockholders, if the corporation refuses to institute such a suit. Shickel v. Watts, 94 Mo. 410; Van Cleve v. Berkey, 143 Mo. 109; Berry v. Rood, 168 Mo. 328; Hequembourg v. Edwards, 155 Mo. 520; Stone Cutter Co. v. Scott, 157 Mo. 525; Chrisman-Sawyer Co. v. Mfg. Co., 168 Mo. 643; Meyer v. Mining Co., 192 Mo. 189; Garrett v. Mining Co., 113 Mo. 330; Land Co. v. Case, 104 Mo. 572; Exter v. Sawyer, 146 Mo. 302. (3) The defendant was a promoter of the Hanlon

Millinery Company. A promoter of a corporation oc-
cupies a fiduciary relation to the corporation which he
promotes and to its stockholders, both present and fu-
ture, and, like all fiduciaries or trustees, cannot make
a personal profit or gain out of any transaction for or
with his principals, either by way of profit in dealings
with the corporation or as remuneration for his ser-
vices in promoting the corporation, unless he makes
full and fair disclosure of his personal profit or gain,
or of the remuneration for his services in promoting.
Promoters are liable to the stockholders of a company,
both present and future, for any secret profits made.
Land Co. v. Case, 104 Mo. 572; Garrett v. Mining Co.,
113 Mo. 330; Exter v. Sawyer, 146 Mo. 302; Land &
Imp. Co. v. Webster, 75 Mo. App. 457; Dickerman v.
Trust Co., 176 U. S. 181; Yeiser v. Paper Co., 107 Fed.
341; Chandler v. Bacon, 30 Fed. 538; Hayward v. Lee-
son, 176 Mass. 310; Fruit Co. v. Buck, 52 N. Y. Eq.
219; Pietch v. Kronkel, 116 Wis. 344; Mining Co. v.
Spooner, 74 Wis. 307; Gas Stove Co. v. Wilcox, 64
Conn. 10; Brewster v. Hatch, 122 N. Y. 350; Bent v.
Priest, 86 Mo. 475; Ward v. Davidson, 89 Mo. 445;
Hannerty v. Theatre Co., 109 Mo. 297; Hill v. Mining
Co., 119 Mo. 22; Hill v. Coal & Mining Co., 124 Mo.
153; Cook on· Corporations, sec. 651; Thompson on
Corporations, secs. 415, 458, 4023-4025, 8493; Alger
on Law of Promoters, secs. 1-42-55-74; 1 Lindley on
Companies, p. 487; Clark & Marshall on Corp., pp.
324-327, and sec. 758; Morawetz on Private Corpora-
tions, secs. 517-518; Perry v. Tuskaloosa, 93 Ala. 364;
Goodhue, F. W. Co. v. Davis, 81 Minn. 210; Bird Seed
& Co. v. Humes, 157 Pa. St. 278; Bank v. Downey, 53
Cal. 466; Sargent v. Railroad, 48 Kan. 672; Railroad
v. Poor, 59 Me. 277; McClure v. Law, 161 N. Y. 78. (4)
When a promoter is called upon to account for secret
profits received, misrepresentation to stockholders
need not be shown, for on the promoter rests the

affirmative duty to make full disclosure of his profits and to obtain the stockholders' consent, with full knowledge of the facts, and in the absence of such disclosure and consent the profit belongs to the corporation and can be recovered by it. Improvement Co. v. Richter, 26 Misc. (N. Y.) 26; Garrett v. Mining Co., 113 Mo. 330; Land Co. v. Case, 104 Mo. 572; Exter v. Sawyer, 146 Mo. 302; Land & Imp. Co. v. Webster, 73 Mo. App. 457; Dickerman v. Trust Co., 176 U. S. 181; Fruit Co. v. Buck, 52 N. J. Eq. 219; Getty v. Devlin, 54 N. Y. 403; Iron Co. v. Bird, 33 Ch. Div. 85; Hayward v. Leeson, 176 Mass. 310; Pietsch v. Millbrath, 123 Wis. 647; Mining Co. v. Spooner, 74 Wis. 307; Brewster v. Hatch, 10 Abbott's N. C. 400, 122 N. Y. 350; Morrow v. Iron & Steel Co., 87 Tenn. 262; Williams v. Evans, 87 Ala. 725. (5) The fact that the defendant caused Hanlon to subscribe for the preferred and common stock does not relieve the defendant of liability in this case. The corporation may ignore the dummy subscriber for stock and proceed against the real subscriber, and this is particularly true where the promoter causes the subscription to be taken in the name of another, for the purpose of concealing his connection with the company and the fact that he has made a secret profit. Hotel Co. v. Wright, 73 Mo. App. 240; Pittsburg v. Spooner, 74 Wis. 307; Arnold v. Searing, 67 Atl. 852; Terwillinger v. Telegraph Co., 59 Ill. 249; Bank v. Talbott, 139 Cal. 45; Bales v. Telegraph Co., 134 Ill. 536; Brie v. Wilcox, 22 N. Y. 551; Shickle v. Watts, 94 Mo. 419; Hayward v. Leeson, 176 Mass. 310; Land Co. v. Leeson, 183 Mass. 37; Pietsch v. Millbrath, 123 Wis. 647; Mining Co. v. Spooner, 74 Wis. 307; Morawetz on Corporations, p. 279. (6) A corporation can sue for and recover secret profits made by promoters and also unpaid subscriptions for stock, and also for stock given by way of bonus to promoters or otherwise, for the benefit not only of creditors, but also of the company

itself, and all future purchasers of stock of the company. Hayward v. Leeson, 176 Mass. 310; Land Co. v. Case, 104 Mo. 572; Exter v. Sawyer, 146 Mo. 302; Garrett v. Coal Co., 113 Mo. 330; Sewage Co. v. Hartmant, L. R. 5 Ch. Div. 394; Simmons v. Vulcan O. & M. Co., 61 Pa. St. 202; Pietsch v. Kronse, 116 Wis. 344; Fountain v. Roberts, 92 Wis. 345; Spaulding v. North, etc., Co., 106 Wis. 481. (7) Defendant contends that it was *ultra vires* of the power of the defendant to subscribe for the stock in this case and refers to the case of Anglo-American, etc., Co. v. Lombard, 132 Fed. 721, as authority for this position, and claims that the United States Circuit Court of Appeals in that case held that the ninth paragraph of Sec. 1427, R. S. 1899, gives trust companies no power to become original subscribers for stock in other companies, but only authorizes such trust companies to buy and sell stock of other companies. The case here relied on by the defendant has no application whatever to the case at bar. That was a suit by a creditor of a Kansas corporation against Lombard and two other corporations, not trust companies, to recover additional or double liability as stockholders of the Kansas corporation under the laws of the State of Kansas. (8) There is no merit in the first contention of the defendant that the second count of the petition fails to state a cause of action because of the withdrawal by the plaintiff of the claim for $100,000 common stock. At the close of plaintiff's case the court instructed the jury that the plaintiff could not recover on the first count of the petition, and this ruling was based upon the proposition that the call for unpaid stock subscriptions was limited to the unpaid subscription on the $100,000 of common stock held by the defendant and did not apply to the unpaid stock subscriptions of the remaining subscribers to the common stock. Thereupon plaintiff took a nonsuit as to the first count of the petition and withdrew its claim

for the $100,000 common stock under the second count. This left the second count of the petition a claim for the $20,000 bonus received by the defendant out of the $70,000 paid in by the other subscribers to the $200,000 common stock of the company. The second count of the petition, therefore, needed no amendment inasmuch as it was then a suit to recover only the secret profits made by the defendant as a promoter. (9) There is no merit in the second point of the defendant. The defendant claims that there is a total failure of proof that the defendant received the $20,000 out of the funds of the Hanlon Millinery Company. The complete answer to this contention is, first, the contract of September 8, 1902, between Hanlon and defendant company, in which it was expressly stipulated that the defendant was to receive a bonus of $20,000 out of the $70,000 produced by the sale of $200,000 of common stock as thirty-five cents, leaving $50,000 of such $70,000 and the $200,000 received from the defendant for the preferred stock and starting the company with $250,000 in actual money. Second, the answer of the defendant, wherein it admits that in consideration of its underwriting or undertaking to sell the preferred stock it was to receive 1,000 shares of the common stock and $20,000 in cash as a bonus, and that after the organization of the company it did carry out this undertaking. Third, the testimony of Hanlon that the contract of September 8, 1902, in reference to the $20,000 bonus was carried out and the money actually paid to the defendant, and that he never agreed that the bonus of $20,000 should be taken out of the $35,000 which Hanlon borrowed by the defendant company to use in payment of the $100,000 of common stock subscribed for by him. Fourth, the testimony of Breckenridge Jones on cross-examination, in which he admitted that he had loaned Hanlon the $35,000 to enable him to pay thirty-five cents on the dollar for the 1000 shares of common stock he

was to receive. The whole contention of defendant in this respect rests upon the fact that the defendant company made out two checks for this loan of $35,000 to Hanlon, one for $20,000 and the other for $15,000, both of which were payable to Hanlon's order, and they required Hanlon to indorse the $20,000 check in blank and to indorse the $15,000 check to the order of the Hanlon Millinery Company, and then indorse the check in the name of the Hanlon Millinery Company. Both of these checks were retained by the defendant company and the whole matter was managed by the defendant company in its own way, it being the depository of the funds of the plaintiff company. In this connection it is proper to call attention to a statement in the brief of the defendant that Hanlon sold the 2000 shares of preferred stock to the defendant company for $200,000 and that Hanlon paid only fifteen cents on the dollar for the 1000 shares subscribed for by him. The preferred stock was paid for by a check of the defendant company for $200,000 to the order of the plaintiff company, and that check was indorsed by Hanlon as president of the company, and was deposited to the credit of the plaintiff company in the defendant bank. The contention of the defendant that Hanlon only paid fifteen cents on the dollar on account of his stock subscription is based entirely upon the contention that the $15,000 check which the defendant made out to the order of Hanlon, being a part of the $35,000 which Hanlon borrowed from the defendant, was credited on the books of the defendant bank to the plaintiff company, and that the check for the remaining $20,000 was not credited to the plaintiff company on account of Hanlon's stock subscription, but was retained by the defendant as the cash bonus which it was to receive under the contract of September 8, 1902. This contention is so frivolous that further comment thereon is unnecessary.

GRAVES, J.—Plaintiff's petition is in two counts, but under the first count an involuntary nonsuit was forced, and no appeal taken, so that this count is only material in a general way. Both counts are actions at law. Under the first count it was sought to recover from defendant the sum of $100,000 on account of the alleged unpaid subscription price of 1000 shares of common stock in the Hanlon Millinery Company. The second count, and the one particularly here for review, reads as follows:

"For a second cause of action plaintiff states that heretofore, to-wit, on September 8, 1902, the defendant, its officers and agents, entered into an agreement, in writing, with Richard Hanlon to organize a corporation under the laws of the State of Missouri and particularly the laws thereof relating to manufacturing and business companies, under the name of the Richard Hanlon Millinery Company, with a capital stock of $500,000, of which $200,000 was to be seven per cent cumulative stock, preferred in dividends and in distribution, and the remaining $300,000 to be common stock; pretending that the whole thereof was paid up, while in truth and in fact only thirty-five cents on the dollar was paid by subscribers to 980 shares by persons other than the defendant and said Hanlon; that the defendant agreed to subscribe for and did subscribe for and receive and pay for the $200,000 preferred stock; and in consideration of so doing it was unlawfully agreed between said defendant and said Hanlon that the defendant should receive, and it did in fact receive, $100,000 of the common stock of said company, no part of the subscription price whereof was ever paid, and also the sum of $20,000 out of the $70,000 paid on account of stock subscriptions by other bona fide subscriptions to the stock of said company; that said unlawful agreement, and the stock and money aforesaid, received by defendant, was concealed by the defendant and the board of directors

of said company, which were completely dominated
and controlled by defendant, from the original bona
fide subscribers to the stock of said company, and
from the knowledge of subsequent purchasers of such
stock, and did not become known to them until, to-wit,
June, 1907; that said stock and said cash were ex-
acted and received by the defendant as a secret profit
for promoting said company and for subscribing for
the preferred stock aforesaid.

"Plaintiff further states that heretofore, to-wit,
on July 2, 1907, it demanded from defendant the pay-
ment of one hundred thousand dollars, the unpaid sub-
scription on said stock, which the defendant had caused
to be subscribed for by Richard Hanlon as its agent,
and so as to conceal from the other stockholders and
from the world the knowledge of such arrangement,
and also demanded the twenty thousand dollars se-
cret profit so received by defendant, but that defend-
ant has refused and still refuses to pay the same.

"Wherefore, plaintiff prays judgment against de-
fendant for the sum of one hundred and twenty thou-
sand dollars with six per cent interest from September
22, 1902, and costs."

It will suffice to state at this point that the an-
swer to this count of the petition fully placed in issue
the matters and things pleaded by the plaintiff. Some
features of the answer may require special notice, but
this will be adverted to in the course of the opinion.
The contract referred to in the petition reads:

St. Louis, Mo., September 8, 1902.
Mississippi Valley Trust Company,
    St. Louis, Mo.
Dear Sirs:
    I propose organizing the Hanlon Millinery Company under
the laws of Missouri, on or before December 31, 1902, with a
capital of $500,000, divided into shares of $100 each, of which
$200,000 shall be seven per cent cumulative stock, preferred in
dividends and in distribution, and the remaining $300,000
to be common stock, and all the said capital stock to be full

paid by the transfer from me to the company of $250,000 in cash, and contracts with salesmen, and an organization which will guarantee the sale of approximately $1,000,000 worth of goods the first year; I may also turn over, as part of the consideration, leases to a place to do business.

My plan is to sell $200,000. of preferred stock at par, giving therewith a bonus of 50 per cent thereof in common stock, which will leave me $200,000 worth of common stock, which I will sell for thirty-five cents on the dollar, thereby bringing in $70,000.

I recognize the value of having a financial institution such as yours to further such an enterprise, and I make you this proposition: If you will subscribe and pay for, for yourselves or other parties selected by you, $200,000 of said preferred stock ($100,000 of said common stock to go as a bonus therewith), I will allow you, out of the $70,000 produced by the sale of $200,000 of common stock at thirty-five cents, $20,000, leaving 50,000, which, with the $200,000 produced by the sale of the preferred stock, will start the corporation with $250,000 actual money in hand. The showing as to the amount of business controlled by the salesmen selected to be subject to your approval.                    RICHARD HANLON.

Accepted:

Missouri Valley Trust Co.

By Breck. Jones,
  Vice-President.

Upon trial before a jury the plaintiff had a verdict for $28,300 under the second count of the petition, and from a judgment entered thereon defendant has appealed. This verdict covers the alleged bonus of $20,000 and the interest thereon. To avoid *res adjudicata* the plaintiff was permitted to eliminate from this second count of the petition its claim of $100,000 for unpaid stock subscription at the time the demurrer to the evidence was sustained to the first count and the involuntary nonsuit as to such first count was taken. Among other things the first count of the petition charged that "the defendant was and still is a duly incorporated company, organized under the laws of the State of Missouri, *and particularly the laws of this State relating to the trust companies*." The answer admitted such a corporation and the trial proceeded upon this theory. This we

mention because the doctrine of *ultra vires* is involved in appellant's brief.

Such is the general outline of the case, and the facts will be given more in detail in connection with the points urged.

I.  As suggested in the statement one of the questions urged by the defendant is its power to enter into the contract set out, if such contract is to be given the construction claimed for it by the plaintiff, i. e., that the defendant agreed to become a promoter of the prospective Hanlon Millinery Company.  The plea of *ultra vires* is duly made in the answer and hence the question is here.  Plaintiff pleads that defendant was and is a corporation organized under our trust company statutes, and defendant says, That is true, but as such a corporation we have no charter power to agree to become the sole or joint promoter of a proposed corporation, or to subscribe to its capital stock, or agree to subscribe to such capital stock.  This question of *ultra vires* is not elaborately discussed by appellant in the brief, but the point is made and one case cited.  Respondent makes no reply to this contention. The question was duly raised by the answer (which must be done, where *ultra vires* is relied upon by the corporation as a defense—5 Ency. Pleading & Practice, p. 96), and is pressed in the brief and its magnitude and importance demands consideration.  *Ultra vires* as a defense is not always looked upon with favor, but the protection of innocent and ignorant stockholders in great financial institutions demands that contracts made by such institutions be clearly scrutinized upon the question as to whether or not the corporation in law had the right to make them.  The defense of *ultra vires* is much like the defense of the Statute of Limitations, and is well rooted in public policy. One dealing with a corporation must deal with it

*Promoter: Ultra Vires Contract: Trust Company.*

through agents, and therefore must know the limits to contracts which can be made by the corporation, as such limits are prescribed by the laws of the land. A wise public policy as expressed by our statutes fixes the character of business which may be transacted by any particular class of corporations. The stocks of these corporations often fall into the hands of the ignorant and unsuspecting. As stockholders they elect their agents in the shape of a board of directors upon the theory that such agents cannot in law involve them in contracts not authorized by their charter. Woeful results to unsuspecting stockholders would follow unrestrained power in the directing body of the corporation to make business contracts. Stockholders of a bank would not want their directors to go into the business of manufacturing ice, and would not elect them upon that theory. They are elected upon the theory that they understand and can make wise contracts in the lines of banking, but no thought is given of their fitness for the ice business. So, too, stockholders of trust companies are elected upon the theory that they can make wise contracts within the legitimate lines of such a business, but no thought is given of their fitness for other lines of business.

The defense of *ultra vires* is, therefore, bottomed upon a wise public policy to protect the stockholders (the real body of the corporation) from the acts of their own agents, where such agents clearly do acts or make contracts beyond the charter powers and rights of the corporation. Nor is such defense unfair to the other contracting party, because he, with knowledge of the limited power of the corporation agents to make contracts, is *particeps criminis* when he enters into an *ultra vires* contract. In other words, he assists the agents of the corporation to do a thing which in law he must know to be in violation of the rights of the stockholders of the corporation. The questions therefore are (1) what is this contract, and

(2) is it *ultra vires*. If *ultra vires*, it is void and no subsequent acts of the corporation by way of ratification or otherwise can breathe life into it. [Common Sense Min. & Mill Co. v. Taylor, 247 Mo. 1; Anglo-American Land, M. & A. Co. v. Lombard (U. S. Cir. Ct. of App.), 132 Fed. l. c. 736.]

We must discuss this case and the contract in the light of the second count of the petition, which after the claim of $100,000 was eliminated therefrom by the plaintiff, was an action to recover from the defendant the bonus of $20,000 mentioned in the contract. This count of the petition can only stand upon the theory that defendant was the real promoter of the Hanlon Millinery Company, and as such real promoter made a secret profit of $20,000. In fact, counsel for plaintiff urges that Richard Hanlon was but the agent of the defendant, and that the defendant was the real promoter of the Millinery Company. Plaintiff urges that the contract of September 8th should be so construed, or at least construed to the effect that defendant was one of the promoters.

Thus under point 3, of the brief we find in large black type the caption: "The defendant was a promoter of the Hanlon Millinery Company." Point 4, of the brief reads: "When a promoter is called upon to account for secret profits received, misrepresentation to the stockholders need not be shown, for on the promoter rests the affirmative duty to make full disclosure of his profits and to obtain the stockholders' consent, with full knowledge of the facts, and in the absence of such disclosure and consent the profit belongs to the corporation and can be recovered by it." And point 5 reads: "When a promoter is shown to have made a personal profit out of the organization of a corporation, a prima facie case is made against him, and he must repay it to the corporation, unless he shows as a matter of defense that he made full and complete disclosure of the amount of his profit to all

parties interested in the corporation and obtains their consent.''

So that it is clear that the plaintiff construes the contract to be one for the promotion of the Hanlon Millinery Company, and therefore contends that defendant is liable to the newly formed corporation in the sum of $20,000 for secret profits made in such promotion. This is the sole liability, if any, of the defendant in the case as it stands before us. The question, therefore, is: can the defendant under its charter be a promoter of another corporation, or enter into a contract to promote another corporation? The answer must be sought from the charter powers of defendant, a Missouri trust company. Such charter powers at the date of this contract of September 8, 1902, are found in section 1427, Revised Statutes 1899 (now after slight amendments, Sec. 1124, R. S. 1909.) This section reads:

''Corporations may be created under this article for any one or more of the following purposes: 'First, to receive money in trust, and to accumulate the same at such rate of interest as may be obtained or agreed upon, or to allow such interest thereon as may be agreed, not exceeding in either case the legal rate, and the payment to them or their order of deposits made by minors shall be binding on them; to receive upon deposit for safe-keeping personal property of every description; to guarantee special deposits, and to own or control a safety vault and rent the boxes therein. Second, to accept and execute all such trusts and perform such duties of every description as may be committed to them by any person or persons whatsoever, or any corporation, and act as assignee, receiver, trustee and depository, and to accept and execute all such trusts and perform such duties of every description as may be committed or transferred to them by order, judgment or decree of any of the courts of record of this State or other State, or of the United States.

Third, to take, accept and hold, by the order, judgment or decree of any court of this State, or of any other State, or of the United States, or by gift, grant, assignment, transfer, devise or bequest of any person or corporation, any real or personal property in trust, and to execute and perform any and all such legal and lawful trusts in regard to the same, upon the terms, conditions, limitations and restrictions which may be declared, imposed, established or agreed upon in and by such order, judgment, decree, gift, grant, assignment, transfer, devise or bequest, and to execute as principal or surety, and to guarantee against loss any principal or surety upon any bond or bonds required by law to be given in any proceeding in law or equity in any of the courts of this State or other State, or of the United States. Fourth, to act as agent or attorney in fact for any person or corporation in the management and control of real or personal property and the sale or conveyance of same, and for the investment of money, and to act for and represent corporations or persons under power and letters of attorney, and as agents for persons and corporations for the purpose of issuing, registering, transferring or countersigning the certificates of stock, bonds or other evidences of debt of any corporation, association, municipality, State or public authority, on such terms as may be agreed upon. Fifth, to accept from and execute trusts for married women in respect to their separate property, whether real or personal, and act as agent for them in the management of such property, and generally to have and exercise such powers as are usually had and exercised by trust companies. Sixth, to act as executor under last will or administrator of the estate of any deceased person, or as guardian or curator of any infant, insane person, idiot or habitual drunkard, or trustee for any convict in the penitentiary, under the appointment of any court of record having jurisdiction of the person or estate

of such deceased person, infant, insane person, idiot, habitual drunkard or convict. Seventh, to guarantee the fidelity and diligent performance of their duty of persons or corporations holding places of public or private trust; to guarantee or become surety on any bond given by any person or corporation, and to reinsure or guarantee any person or corporation against loss or damage by reason of any risk assumed by insuring the fidelity or diligent performance of duty of any such person or corporation, or by guaranteeing or becoming surety on any bond, to guarantee the principal or interest, or both, of any securities of any kind, and to certify and guarantee titles to real estate. Eighth, to loan money upon real estate and collateral security and execute and issue its notes and debentures payable at a future date, and to pledge its mortgages on real estate and other securities as security therefor, which notes and debentures may be issued to an amount not exceeding, in the aggregate, ten times the amount paid upon the capital stock of the company issuing the same, and shall in no case exceed the amount of first mortgages pledged to secure their payment. Ninth, to buy and sell all kinds of Government, State, municipal and other bonds and all kinds of negotiable and non-negotiable paper, stocks or other investment securities.''

To our minds the ninth clause of this section is the only one that need be discussed, for no semblance of power to promote a corporation is found in any one of the eight previous clauses. Note, therefore, the powers in this clause granted, *''to buy and sell all kinds* of Government, State, municipal and other bonds and all kinds of negotiable and non-negotiable paper, *stocks* or other investment securities.''  The italics are ours. The power here given is the power ''to buy and sell'' stocks, but that does not mean by implication or otherwise that a trust company can engage in the business of a promoter of other corporations. Such

power to "buy and sell" means to buy and sell in the ordinary course of commercial business. Had the legislators intended to confer upon such trust companies the right and power to promote the organization of other corporations they could have found apt words in which to have given expression to such intent. A trust company can say to an individual or to a number of individuals, You organize a corporation upon a given scheme, and we will buy or sell your stock or bonds, in the usual commercial way of buying and selling such securities; but it cannot go into the business of promoting a corporation, nor can it become or contract to be a "promoter" in the usual legally accepted definition or sense of the term.

The powers of a Missouri trust company under the statutes of 1889 (which are substantially the same as those of 1899), by the United States Circuit Court of Appeals for the Eighth Circuit (SANBORN, THAYER and VAN DEVANTER, JJ., presiding), have been thus discussed in the case of Anglo-American Land, M. & A. Co. v. Lombard, 132 Fed. l. c. 736:

"One object in the transaction between the Kansas Company and the Missouri Company was to transfer to the latter all of the stock of the former, and thus enable the Missouri Company to control the affairs of the Kansas Company, and to exercise its powers through the use of its name. Whatever may have been the effect of the transaction in other respects it was in this respect beyond the powers of the Missouri Company, and void. The settled rule is that a corporation possesses only such powers as are expressed or fairly implied in the statute by or under which it is created; that the enumeration of these powers implies the exclusion of all others; and that any ambiguity or doubt respecting the possession of any particular power arising out of the terms used in the statute is to be resolved against its possession. This rule is fully recognized in the State of Missouri. [State ex

inf. v. Lincoln Trust Co., 144 Mo. 562; Newland Hotel
Co. v. Lowe Furniture Co., 73 Mo. App. 135.] Where it
is not otherwise provided, the implication in a grant of
corporate power and life is that the corporation shall
exercise its powers and carry on its business through
its own officers and employees, and not indirectly,
through another corporation operated under its con-
trol, and that it shall maintain an independent cor-
porate existence, and not surrender the control of its
affairs or the exercise of its powers to another cor-
poration.    Conceding that a corporation of a pri-
vate character, not charged with any public duties,
may, in pursuance of appropriate action on the part
of its stockholders, sell all of its property, wind up
its affairs, and permanently retire from business, still,
in the absence of express authorization, neither the
corporation nor its stockholders can, incidental to the
sale of its property or otherwise, clothe another cor-
poration with the right to maintain the corporate life
or exercise the corporate powers.    These views are
sustained and the reasons therefor are fully set forth
in De La Vergne Co. v. German Savings Institution,
175 U. S. 40, 54, 20 Sup. Ct. 20, 44 L. Ed. 65; Buckeye
Marble & Freestone Co. v. Harvey, 20 S. W. (Tenn.)
427, 18 L. R. A. 252, 36 Am. St. Rep. 71; Easun v.
Buckeye Brewing Co., 51 Fed. (C. C.) 156, and in the
cases there cited.   The De La Vergne case presented
the question whether one company could purchase with
its own stock the stock of another company which was
insolvent and had ceased to do business; the purpose
being to prevent the reorganization of the latter com-
pany, and to obtain its patronage.   The court declared
the purchase *ultra vires* of the purchasing company
and void, saying:

" 'But as the powers of corporation created by
legislative act are limited to such as the act expressly
confers, and the enumeration of these implies the ex-
clusion of all others, it follows that, unless express

permission be given to do so, it is not within the general powers of a corporation to purchase the stock of other corporations for the purpose of controlling their management.'

"The only authority of the Missouri Company to purchase stock in another corporation is found in subdivision 9, section 2839, Revised Statutes 1889, which reads: 'To buy and sell all kinds of Government, State, municipal and other bonds, and all kinds of negotiable and non-negotiable paper, stocks and other investment securities.' The context shows very clearly that the purpose was not to authorize the purchase of all the stock of another company for the purpose of controlling its management, but to authorize the buying and selling of stocks as investment securities, in like manner as Government bonds and the other securities named are bought and sold. Controlling the management of a corporation of another State through the ownership of its entire stock is not buying or selling investment securities, nor is it fairly incidental thereto. The hazards of such a venture are altogether repugnant to the purposes for which the Missouri Company was formed, which included the handling and investing of the money of others, executing trusts under deeds and wills, acting as guardians of infants and insane persons, and guaranteeing the fidelity of persons holding places of public or private trust; all requiring the maintenance of a high standard of credit and stability on the part of that company. It is impossible to escape the conclusion that the purchase of the Kansas Company's stock was beyond the powers of the Missouri Company.

"In the absence of any established rule of decision in the State of Missouri in respect of the effect of corporate acts which are *ultra vires* (and no local rule of decision has been called to our attention by counsel), we must apply to this case the rule recog-

nized in the Supreme Court of the United States. That rule, as stated in Central Transportation Co. v. Pullman Car Co., 139 U. S. 24, 59, 11 Sup. Ct. 478, 35 L. Ed. 55, and as applied in many subsequent cases, is:

"'A contract of a corporation which is *ultra vires,* in the proper sense—that is to say, outside the object of its creation as defined in the laws of its organization, and therefore beyond the powers conferred upon it by the Legislature—is not voidable only, but wholly void and of no legal effect. The objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it. When a corporation is acting within the general scope of the powers conferred upon it by the Legislature, the corporation, as well as *persons* contracting with it, may be estopped to deny that it has complied with the legal formalities which are prerequisite to its existence or to its action, because such requisites might in fact have been complied with. But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation nor the other party to the contract can be estopped, by assenting to it, or by acting upon it, to show that it was prohibited by those laws.'

"[See, also, McCormick v. Market Bank, 165 U. S. 538, 17 Sup. Ct. 433, 41 L. Ed. 817; California Bank v. Kennedy, 167 U. S. 362, 367, 17 Sup. Ct. 831, 42 L. Ed. 198; Concord First National Bank v. Hawkins, 174 U. S. 364, 19 Sup. Ct. 739, 43 L. Ed. 1007; Thomas v. Railroad, 101 U. S. 71, 25 L. Ed. 950; Scovill v. Thayer, 105 U. S. 143, 26 L. Ed. 968; Pennsylvania Railroad Co. v. St. Louis, etc. Railroad Co., 118 U. S.

290, 6 Sup. Ct. 1094, 30 L. Ed. 83; Schofield v. Goodrich Bros. Banking Co., 39 C. C. A. 76, 98 Fed. 271.]''

So we say that if the contract of June 8th is to be construed as an agreement upon the part of the defendant to promote a corporation it is *ultra vires* and void.

II.  But does it avail the defendant in this case to say that the contract made with Hanlon is void?

**Money Had and Received: Ultra Vires Contract as Defense.** This second count is not really a suit upon the contract, although the contract is mentioned therein.  It is a suit at law to recover back the money paid under the contract.  It in effect says that the contract was one which violates the fiduciary relation which exists between a promoter of a corporation, and those who were induced by the promoter to become subscribers to its stock.  On plaintiff's theory, and that is the theory we must meet in discussing the plea of *ultra vires,* Hanlon was in reality acting for defendant; that the alleged contract was but an understanding between two promoters, one of whom in some things was acting for the other.

If the contract were only executed upon one side, then the plea of *ultra vires* would be unavailing, because a corporation cannot receive money to do a thing and fail to do that thing, and after keeping the money, excuse itself from liability by a plea of *ultra vires.* *Vide* opinion of ROMBAUER, P. J., in Winscott v. Investment Co., 63 Mo. App. 1. c. 369, where the rule is tersely stated.  But we need not discuss this contract as an instrument forming the basis of a cause of action.  It is sufficient to say that it is not the basis of the cause of action now before us.  In this cause it is evidentiary only.  It evidences the manner in which defendant was connected with the Hanlon Millinery Company.  It is perhaps better to say that it is one of the things which tends to show the relationship be-

tween defendant and that corporation. The real question is, If as a fact, the defendant did promote the Hanlon Millinery Company and in such work did wrongfully make a secret profit of $20,000, can it plead its *ultra vires* act, not its *ultra vires* contract with Hanlon, as a defense to a suit which seeks to recover these secret gains? Ordinarily we would say no, but this depends upon who is attempting to recover the alleged secret profiits. What was done in this case, upon plaintiff's theory, is that defendant in fact received $200,000 of preferred stock and $100,000 in common stock, and paid only $180,000 therefor. So that we say that, while it would be an act *ultra vires* for a trust company in Missouri to promote another corporation, or to agree by written contract to promote the same, yet we are not prepared to say that the plea of *ultra vires* here imposed absolutely defeats this action, for the reasons above stated. There are questions which do defeat this case, and these we take next.

III.  Conceding that the defendant was in a sense a promoter of the Hanlon Millinery Company; conceding further that the defendant got the

Promoter: Secret Profits: Common Stock as Bonus.

$20,000 in cash and $100,000 in stock as a bonus, and that this exact fact was not known to all the original purchasers of stock, yet we do not think there can be a recovery in this case under admitted facts herein. Let us re-state in a way the facts as applicable to the point now in hand. Whatever was done, was done along the line of the September contract, supra. The stock, both perferred and common, was not issued to defendant in the first instance, but was issued to Hanlon, and by him assigned to defendant. Defendant paid the $200,000 in cash for the preferred stock, and this money went into the treasury of the Millinery Company. Defendant got the common stock

mentioned in the contract, and paid nothing additional therefor. Hanlon borrowed from defendant $35,000 upon his own note and collateral. Of this $35,000 the sum of $15,000 was turned over to the Millinery Company and $20,000 of it was paid by Hanlon to the defendant. This $20,000 never went into the possession of the Millinery Company. In other words, the $35,000 was at one time defendant's money, and turned over by it to Hanlon on Hanlon's individual note, secured by Hanlon's individual collateral. It was turned over in two checks, one for $15,000, which found its way into the Millinery Company's treasury, and one for $20,000, which was turned over to defendant by the indorsement of Hanlon. It is evident from the record that all of the original stockholders knew that some kind of a deal had been made with defendant for the disposition of the preferred stock. But this is not so material here. The Hanlon Millinery Company opened up for business, and continued in business until November, 1906, when bankruptcy proceedings were begun against it. Thus conditioned a settlement of its obligations was an uppermost question. The corporation was heavily indebted to defendant for actual cash. Hanlon, the leading spirit of the corporation, was likewise personally indebted to defendant. In this fix, and to clear, if possible, all obligations, Hanlon entered into the following contract, which contract was ultimately consummated, and Hanlon became possessed of all the stock, both preferred and common, which had theretofore been held by the defendant, as well as some other stock. The contract reads:

This contract, made and entered into this 28th day of January, 1907, in duplicate, by and between Murray Carleton of St. Louis, Missouri, party of the first part, and Richard Hanlon of the city of St. Louis, Missouri, party of the second part,

Whereas, the party of the first part is the owner of notes described upon Schedule A. hereto annexed, made by the Richard Hanlon Millinery Company of the city of St. Louis,

amounting in the aggregate, less the credits thereon, to $173,-659.56; and,

Whereas, said party of the first part is also owner of two collateral notes made by Richard Hanlon, one dated August 12, 1902, for $7,500, payable on demand, with five per cent interest from its date, bearing a credit dated September 4, 1904, $5,686.95, and also a credit dated December 8, 1905, for $1,800, upon which said note interest has been paid to September 30, 1906, the credits thereon being the proceeds of the collateral hypothecated with said note; the other note being dated December 10, 1902, made by Richard Hanlon, in the sum of $35,000, payable on demand, bearing a credit of date December 11, 1906, for $20,000, being the proceeds of all the collateral pledges with said note, excepting one thousand shares of the common stock of the Richard Hanlon Millinery Company, upon which said note interest has been paid to December 30, 1906; and,

Whereas, the said Richard Hanlon Millinery Company is now insolvent and a petition in bankruptcy is pending against it in the United States District Court for the Eastern Division of the Eastern Judicial District of Missouri; and,

Whereas, said party of the second part desires to acquire from said party of the first part all the notes aforesaid, and also all the stock of the said company owned by said party of the first part, and twenty thousand dollars of the preferred stock of said company owned by Joseph and Arthur Wear, and also three hundred shares of the common stock owned by said Joseph and Arthur Wear; and,

Whereas, the said Richard Hanlon is endeavoring to effect a settlement with all the creditors of the Richard Hanlon Millinery Company, and to that end will require the final assistance of the party of the first part, which assistance the said party of the first part is willing to render provided he is fully protected in any advances he may make in that regard, and provided furthermore that he receives in full payment and satisfaction of his claims and demands against the Richard Hanlon Millinery Company and the said Richard Hanlon individually, the sum of $100,000, which said payments shall include the sale and delivery by him, said party of the first part, to said Richard Hanlon, of the common and preferred stock hereinbefore referred to;

Now, therefore, in consideration of the premises, it is contracted and agreed as follows:

First. That contemporaneously with the execution of this agreement there shall be deposited by said party of the second part with said party of the first part the sum of $35,000, which said sum shall be held by him and be applied by him upon said one hundred thousand dollars to be paid as hereinbefore indicated, provided the settlement contemplated to be made by

said Richard Hanlon is consummated; otherwise, said sum of thirty-five thousand dollars shall be returned to said Richard Hanlon.

Second.    The balance of sixty-five thousand dollars to be paid to said party of the first part shall be paid to him on or before April 1, 1907.

Third.    Said party of the first part agrees that for the purpose of assisting the said party of the second part in the consummation of the settlement hereinbefore referred to, he will cause to be purchased such claims and demands against the said Richard Hanlon Millinery Company as shall be duly proven in bankruptcy, accompanied by powers of attorney executed in blank, or to such party as he may designate, such claims also being accompanied by assignments wherein the said claims or demands are assigned to John R. Cook, on such a basis that the general average cost of all the claims so purchased by him shall not exceed at his option thirty-three and one-third per cent of the face thereof.

Fourth.    In the event that a settlement is effected for the said Richard Hanlon Millinery Company, either by way of composition in bankruptcy, or with the creditors outside of bankruptcy proceedings, then the said party of the first part, upon the payment to him of one hundred thousand dollars, hereinbefore referred to, and the payment to him of the purchase price of the claims against the Richard Hanlon Millinery Company so purchased by him, will release and discharge the said Richard Hanlon Millinery Company of and from the claims and demands upon the notes hereinbefore described, as well as upon the claims and demands purchased by him hereinbefore described, and will also release Richard Hanlon from all his claims and demands against him.    It is further agreed that if the party of the first part is unable to obtain from Joseph and Arthur Wear the preferred and common stock owned by them in the Richard Hanlon Millinery Company hereinbefore referred to, for a sum not to exceed four thousand dollars and is unable therefore to make delivery thereof on or before April 1, 1907, to said Richard Hanlon, the said second party shall pay to said first party the sum of ninety-six thouand dollars in lieu of the one hundred thousand dollars hereinbefore referred to.

Fifth.    It is agreed and understood that all the moneys to be paid by said party of the second part to the party of the first part, shall be paid on or before April 1, 1907, and in the event of the failure of the party of the second part to make such payment on or before said date, then this contract shall be deemed void and of no effect at the option of the party of the first part, and upon the contract being declared terminated, the thirty-five thousand dollars heretobefore deposited by the party of the second part with the party of the first part shall be returned to said party of the second part without interest;

but the title and absolute ownership to all claims and demands purchased by or for account of said first party, as hereinbefore provided for, shall remain in said first party or in the assignee thereof for his account.

Sixth.    It is further agreed that until payment has been made to the first party of all sums provided for to be paid. him hereunder, the management and control of the Richard Hanlon Millinery Company shall continue as it is at present, unless said first party consents to a change being made.

Seventh.    In the event that the proposed settlement to be made by said Richard Hanlon Millinery Company fails, then all proofs of claim and powers of attorney controlled by the said party of the second part or his attorneys shall be assigned and turned over to the party of the first part or to whom he may at said time direct; and in the event that there should be an adjudication in the bankruptcy proceedings hereinbefore referred to, and there shall be a creditors' meeting called for the purpose of electing a trustee in bankruptcy of the Hanlon Millinery Company, then the proofs of claims and powers of attorney controlled by the said Hanlon or his attorneys, shall at the election of the party of the first part be either turned over to such person as said party of the first part may direct, or the said claims shall be voted at said creditors' meeting by such attorneys as he, the said party of the first part, may direct.

In witness whereof, the parties have hereunto set their hands the day and year first above written.

                                MURRAY CARLETON.
                                RICHARD HANLON.

Richard Hanlon by the consummation of this agreement became possessed of all the preferred stock and practically all of the common stock of the defunct corporation. In other words, he became in fact the corporation. This stock he claims to have afterward sold to his nephew, Wm. J. Crane, for the alleged consideration of $15,000 of which $10,000 was a note of Hanlon's held by Crane, and $5000 in cash or check. Crane was on the board of directors of the Hanlon Millinery Company in November, 1906, when a resolution was passed to the effect that the corporation go into liquidation. He had full notice of its condition. It was in fact a bankrupt, and after compromising its debts at about one-third of the actual amount, had

left some four or five thousand dollars in old accounts or claims. In this situation, it is clear that Hanlon had a new board of directors selected of his kinsmen and friends, and such board of directors had this suit brought. Another fact of importance is that no man paid more than thirty-five cents on the one dollar for the common stock, so that each and every one of the original subscribers knew, when they received full-paid stock, that a rebate of sixty-five cents on the one dollar had been allowed them for the contracts and lease which went to the corporation. Whether all the original subscribers knew the exact· terms of the deal· with defendant is doubtful, but they all did know that there was some kind of a deal, and they all did know that full-paid common stock was being issued for thirty-five cents on the dollar. No original subscriber to stock is making any claim save and except Hanlon, through his nephew W. J. Crane. The *bona fides* of the transfer from Hanlon to Crane is challenged in the answer, but the court declined to allow defendant the right to make proof on the question. This, however, for the present point we deem immaterial. A suit by a corporation against its promoter to recover secret profits, is a suit in the interest of innocent stockholders, not one in the interest of the guilty. In this case, the sole party interested in a recovery here is the holder of the preferred stock. This stock is ostensibly in the hands of Crane, but for the point in hand it may be considered as being there in good faith (a thing which our experience and observation leads us to doubt from this record), yet there should be no recovery in this case. Crane is in no sense an innocent holder for value of this stock. He was not misled in the purchase of this so-claimed full-paid stock. He bought, if he bought at all, stock of a bankrupt corporation at four cents on the dollar. He had been director of the corporation, with the books of the corporation at his command. He knew, or by the exercise of any dili-

gence might have known just how this stock he acquired was paid for by the original subscriber. His grantor knew all the facts. His grantor's grantor was possessed of all the facts. He knew the corporation was bankrupt. The books of the corporation showed the cash received for stock, and he must have known that no stock had ever been fully paid. And more significant still, Crane fails to testify in the case, so that we say that Crane, the alleged holder of the preferred stock, was not an innocent purchaser, but bought with his eyes open. Whilst he was first in the board of directors the following resolution was spread upon the corporate record:

"That this company now go into voluntary liquidation and that as the assets are realized upon, the proceeds shall be disbursed *pro rata* amongst all its creditors, and that after all its creditors have been satisfied, the balance remaining shall be paid to the preferred stockholders to the extent of its par value and any balance remaining shall be paid to the common stockholders."

This resolution is there now, unrescinded and is the main-spring of this action. No recovery in this case could ever benefit an innocent holder of common stock, if there be such a party. No creditor is involved, because the debts have been paid in the compromise. No property is left to first pay the preferred stock, because the corporation is a bankrupt, with but $4000 in stale accounts, and this alleged cause of action against defendant. Under the resolution the recovery here, if permitted to stand, would be, not in favor of an innocent and injured stockholder, but in the interest of one in possession of all facts, and to my mind, one who if a bona fide purchaser purchased for a purely speculative lawsuit.

The evidence in this record fails to show a single innocent stockholder, if such there ever was in the concern (a matter which we doubt from the record),

who has manifested any interest in the promotion of this suit, or who in any way has sought to have the corporation institute or maintain it. None but innocent stockholders can in the name of the corporation, sue for and recover in an action for alleged secret profits. Those who are guilty or possess all the facts, cannot themselves sue, or use the corporate name in such a suit. Now recollecting that there are no creditors of this defunct corporation, and recollecting the further fact that no stockholder paid more than thirty-five cents on the dollar for his stock, let us see as to the applicable law. In 1 Cook on Corporation (6 Ed.), sec. 39, page 135 et seq., the general doctrine is thus stated:

"Stockholders in a corporation, who participate or aid in the issue of paid-up stock, upon payment of less than its par value, or who have knowledge of the act and acquiesce therein, cannot afterwards complain of the transaction, either in their own behalf as stockholders or creditors or in behalf of the corporation. They are bound by estoppel or acquiescence. So also as to the parties who actually received the stock at less than its par value. They are not allowed to repudiate the transaction and recover from the corporation the money they may have already paid thereon. A stockholder who has received stock at less than par cannot compel other stockholders, who have received stock in a similar way, to pay anything further on their stock."

And in section 40 of the same work, at page 139 et seq., the following is announced on the rule: "Not only the participating and acquiescing stockholders, but also their transferees, are bound by the participation or acquiescence. The transferee cannot claim to have greater rights than his transferrer, as regards a general remedy invalidating the whole transaction. He cannot bring suit in behalf of the corporation and other stockholders against the party or par-

ties participating in the issue, inasmuch as his own title is tainted with the same fraud. Nor can he bring an action against the corporation. But the transferree is by no means without a remedy. It may be a fraud on the vendee of stock to sell him as paid-up stock that which is not paid up, although issued as paid up, the vendor having participated in the issue. He may bring an action for damages against the vendor, or against those who, knowing the facts, induce him to purchase, or those who made it possible for the fraud to be practiced, or who actually assisted in perpetrating the fraud upon him.

''The transferee has other remedies. If the sale to him was by one of the participants, he may rescind the sale and recover back the price paid by him; or, if the contract of purchase is not yet completed, he may refuse to take the stock.''

We are cited to the recent case of Hunter v. Garanflo, 246 Mo. 131, as stating a contrary rule, but there is nothing in that case which contravenes the general doctrine hereinabove quoted from Cook. In our case creditors were the complaining parties, not original subscribers to stock or their transferees with notice. In the case at bar all of the original stockholders received full-paid shares at less than par value. In other words, all of them received a bonus, and one cannot complain as to the others. The case law goes so far as to say that even if one of the original stockholders afterward became a creditor, he could not complain as other creditors. [1 Cook on Corporations (6 Ed.), sec. 42, p. 160.] This, upon the theory that such a creditor has full knowledge of the stock conditions when he extended the credit. This court has recently given expression to these views in the very recent case of Biggs v. Westen et al., 248 Mo. 333, 1. c. 344, whereat it is said:

''The testimony in the record shows that the name of J. Brooks Johnson was on the list of subscribers for

the preferred and common stock of the Kline-Drummond Mercantile Company; and though said to have been written by the promoter, J. W. Baker, the fact remains that the stock set out opposite his name was received by him and that he paid the par value of the preferred portion to the corporation direct, and received without further payment the same proportion of common stock allotted to other subscribers. The indorsement on the back of the certificates is admittedly in his own handwriting. Upon this evidence and that of other witnesses touching his knowledge of the plan of stock issuance, we find the fact to be that he knew the corporation was issuing its common stock to the subscribers and purchasers of its preferred stock, with the understanding that nothing whatever should be paid by the recipients of such stock. These conclusions as to the evidence were reached by the trial judge, and they are abundantly sustained by the weight of the credible testimony contained in this record.

"We further find as a fact that the defendant J. B. Johnson had full cognizance of the foregoing facts at the time he exchanged his preferred and common stock for the bonds of the company, upon which he subsequently sought to establish an indebtedness against it in the bankrupt court. And that he became a creditor of the corporation with full knowledge at the time that it had issued its common stock upon an agreement that it was not to be paid for by persons receiving it; and hence, that he did not extend any credit to the corporation upon faith in its ability to demand payment for its common stock. The law is well settled in this State that no creditor of a corporation, who becomes such with knowledge that its stock, though purporting to have been paid in full, was in point of fact neither paid nor to be paid, but was issued merely as a bonus for the subscription and payment for other stock, can enforce his claim against the

corporation by compelling its shareholders to pay to the corporation, its trustee or other representative, any portion of the stock so donated. [Meyer v. Mining & Milling Co., 192 Mo. 162; Trust Co. v. McMillan, 188 Mo. l. c. 567; Shields v. Hobart, 172 Mo. 491; Berry v. Rood, 168 Mo. 316; Woolfolk v. January, 131 Mo. l. c. 637.]

"In the light of this legal principle and according to the preponderance of the testimony in the record showing that defendant Johnson could not have been ignorant of what every other stockholder knew when he acquired his stock in said corporation, the judgment of the trial court excluding the enforceability of the bonds held by him just as it debarred all the other holders of such bonds was manifestly right; and it is affirmed."

The position of a stockholder with knowledge of the facts at the time he acquired the stock is not different from the position of a creditor having knowledge of the facts. There can be no reason in law to say that a creditor with knowledge can't recover, and hold that a stockholder with the same knowledge can recover. In actions for recovering secret profits from promoters the right of the corporation in the suit, where it is brought in the corporation's name, is no greater than the rights of the stockholders for whose real benefit the suit is prosecuted. If the stockholders to be benefited by the action have no rights, as against the promoter, the corporation has none. As said by Mr. Justice HOLMES in Old Dominion Copper Co. v. Lewisohn, 210 U. S. l. c. 212: "For it is only by virtue of the innocent subscribers' position and the promoter's invitation that the corporation has any pretense for a standing in court."

Under the facts in this case the judgment, if affirmed, would inure to the benefit of the holder of the preferred stock, who according to the plaintiff's claim bought it at a time when the corporation itself

was a bankrupt. Not only so, but he bought, if he bought at all, with full knowledge. Such a claimant has no valid claim against defendant, even if it be granted that defendant promoted the corporation. Nor has the corporation any greater rights than has he. Under the facts no case was made for plaintiff and the judgment should be simply reversed.

IV.    There is another matter which precludes plaintiff's recovery in this case. This is, or at least was tried, as a pure action at law. Its purpose is to recover $20,000 of money alleged to have **Secret** belonged to plaintiff at one time, but wrong- **Profits:** **Action** fully appropriated by the defendant. We **at Law.** have hereinabove set out the facts. Not a dollar of the $20,000 here sued for had ever been in the possession of the plaintiff corporation. Hanlon got $35,000 on his own note, secured by his own collateral. Plaintiff even urges in the brief here that Hanlon was the agent of defendant in the whole trans-action of promoting this corporation. But we need not go that far. The money Hanlon borrowed from defendant upon his own note and collateral was Han-lon's money, until Hanlon saw fit to dispose of it. Neither the plaintiff corporation nor any stockholders therein had any legal right to this $35,000 until such time as Hanlon applied it. Hanlon saw fit to pay $15,000 of it to the corporation on his stock subscrip-tion, we presume. At least that much reached the cor-poration treasury. The $20,000 at Hanlon's direction was turned into the treasury of the defendant. Why Hanlon did so is immaterial to the corporation or any stockholders therein. It was Hanlon's money and he could do with it as he saw fit, and the fact that the defendant got it does not render it liable to the cor-poration. There was an utter failure of proof of any right of the corporation or any stockholder therein, whether such stockholder held his stock with or with-

out notice, to the fund received by defendant from Hanlon. It may have been that Hanlon borrowed this $35,000 to pay for his stock, and only used $15,000 for that purpose, but the fact that he borrowed the money for that purpose did not prevent him from doing as he pleased with his own after he got it. There were, therefore, no facts shown which would entitle the jury to a consideration of the case, and a verdict for the defendant should have been directed even under plaintiff's theory of defendant's relation toward the Hanlon Millinery Company. Defendant's evidence, and to our mind the contract in evidence, tends to show that defendant only bought the stock from Hanlon, and on that theory it would not be liable. But with our views upon the other questions this is adrift. Let the judgment be reversed, and the deal closed. All concur, except Bond, J., who having been of counsel below, does not sit.